# SUPREME COURT.

## The Amoskeag Manufacturing Company agt. William T. Garner and another.

*Trade-mark — unauthorized use of corporate name — laches.*

A court of equity will restrain the unauthorized use by another of the name of a corporation (or the distinctive part thereof) given to it by legislative action, and under which it has sold its goods for a number of years.

A corporate name should receive as much protection against its unauthorized use as the name of a natural person, and a corporate name is entitled to protection to the same extent as a trade-mark.

The right to the use of such name is denied not merely upon the narrow ground of the violation of an ordinary trade-mark, but upon the broad principle that the plaintiff is entitled, under such circumstances, to protection against the unauthorized use of its name. Such a use is conclusive evidence of the wrong which the law undertakes to redress, viz.: "The sale of the goods of one person as being those of another."

No distinction can be drawn from the fact that the portion of the name so used originated with a locality instead of with an individual.

*It seems* the consent of a manufacturer to the use or imitation of his trade-mark by another may be justly inferred from his knowledge and silence; but such a consent, whether express or implied, when purely gratuitous, may be withdrawn, and when implied it lasts no longer than the silence from which it springs. It is in reality no more than a revocable license. The existence of the fact may be a proper subject of inquiry in taking an account of profits, if such an account should be decreed; but even the admission of the fact would furnish no reason for refusing an injunction.

Where a manufacturer of cotton goods seeks merely to enjoin the application of his trade-mark, the question of his right to restrain the application of that mark to a variety of cotton goods, in which hitherto he has not dealt, is a sufficiently close one that extreme *laches* would solve that question adversely to him. In such case the question really is not whether his *laches* would prevent his ordinary relief against the application of his trade-mark to goods in which he *has* dealt and on which he *has* stamped it. By not moving sooner he has in effect admitted *that he*

---

Amoskeag Manufacturing Co. agt. Garner.

---

*never intended to apply that mark to the other variety,* and that application thereto by another was a matter which did not concern him.

But where a corporation seeks to enjoin the unlawful use of its corporate name or the distinctive part thereof, the rule is different. *Laches* can never have the effect of a concession that a person will not extend the use or the application of *his name,* nor can it confer upon the wrong-doer the right to build up and establish a business in *another's name.*

The goods of plaintiff are, and have been, sold under the name of "The Amoskeag Manufacturing Company," which was given to it in 1831 by the legislature of New Hampshire. Sometimes its full name has appeared upon the labels affixed to its goods, at others the word "Amoskeag," and again "A. M. Co." and "A. M. C." They are manufacturers of cotton goods in general, and their productions extend to almost every variety of such goods. They have never produced nor dealt in that particular class of cotton goods known as *prints or calicoes,* and consequently have never applied *thereto* its corporate name nor any part of it. The defendants, who are manufacturers of prints or calicoes, some nine years before the commencement of this action commenced to use a label on certain prints of their manufacture, with the word "Amoskeag" thereon, without the license or consent of the plaintiff, and this action is brought to restrain the use of such word.

*Held,* that it was an unauthorized use of the distinctive part of plaintiff's name, and as such should be enjoined, but without damage or account of profits.

*Special Term, July,* 1876.

*Evarts, Southmayd & Choate,* for plaintiff.

*Marsh & Wallis,* for defendant.

BARRETT, *J.*— The main question in this case is, whether the defendants have a right to apply the distinctive part of the plaintiff's name to prints or calicoes.

The plaintiff is and has been for many years a manufacturer of cotton goods in general, and its productions have extended to almost every variety of such goods.

It has never, however, produced nor dealt in that particular class of cotton goods known as prints or calicoes, and consequently has never applied thereto, its corporate name nor any part of it.

Its goods are, and have been sold under the name of " The Amoskeag Manufacturing Company," which was given to it

Amoskeag Manufacturing Co. agt. Garner.

in 1831, by the legislature of New Hampshire. Sometimes its full name has appeared upon the labels affixed to its goods, at other times the word " Amoskeag," and again " A. M. Co.," or " A. M. C."

It is not disputed that, so far as the word "Amoskeag" has been applied by plaintiff to cotton goods actually manufactured and sold by it, the use of such word is its exclusive right. The claim is, that as to any description of cotton goods which the plaintiff has not yet produced, the word " Amoskeag" is common property and that therefore the defendants were at liberty to apply it as their trade-mark, even as against the plaintiff, to prints or calicoes.

This claim rests upon the assumption that the word " Amoskeag " is simply the plaintiff's trade-mark, that is, a geographical name, in which the plaintiff can have no exclusive property except so far as it has been actually applied. It ignores the fact that the word stands for and is, in reality, the distinctive part of the plaintiff's corporate name. If the plaintiff had been incorporated, say as " The Manchester Manufacturing Company," and had used the word " Amoskeag " merely to distinguish its goods, the question whether there could be any property in the name, except as to those classes of goods to which it had actually been applied, would have been presented for consideration.

It would then have been similar to the " I. X. L.," case, where this question was decided in the negative by the examiner in the English patent office (*Browne on Trade-marks*, secs. 68–70), but whether correctly or not remains to be judicially determined. The courts have gone no farther than to say that the property in such marks does not extend to an entirely different line of industry; as if a person does not carry on a trade in iron, but carries on a trade in linen, and stamps a lion on his linens another person may stamp a lion on iron (*Ainsworth* agt. *Walmesley*, 44 *L. J. R.*, 252; *Hall* agt. *Barrows*, 10 *Jur.* [*N. S.*], 55).

But when it is considered that the word "Amoskeag"

stamped upon the plaintiff's goods, is nothing more nor less than an abbreviation, like "A. M. Co.," or "A. M. C.," of "The Amoskeag Manufacturing Company," a very different question, which is the only one really in the case, is up for judgment.

The plaintiff's corporate name was lawfully given to it by legislative action over forty years ago, and there would seem to be no good reason why it should not receive as much protection against the unauthorized use of its name as a natural person. In *Holmes* agt. *Holmes* (37 *Conn.*, 278); and *Newby* agt. *The Oregon Central Railroad Company* (1 *Deady* [*U. S.*], 1), it was held that a corporate name was entitled to protection to the same extent as a trade-mark. In *Ainsworth* agt. *Walmesley* (44 *L. J. R.*, 252), vice-chancellor WOOD said that a man's name was "a still stronger trade-mark than any that can well be devised, subject only to the inconvenience which a name has and a trade-mark has not;" an inconvenience the possibility of which is greatly lessened in the case of a corporation, "that two people may be of the same name."

In this connection, it may be noted that the defendants lay no claim to the name "Amoskeag," either as representing the locality where the prints are manufactured or as in itself indicating the manufacture, origin or ownership of the goods.

Now, it will scarcely be pretended that the defendants have the right to call their prints "The Amoskeag Manufacturing Company prints." And why not? Is it because the plaintiff has acquired a special and limited property *in its own name* by its application to certain articles? Assuredly not. The right is denied, not merely upon the narrow ground of the violation of an ordinary trade-mark, but upon the broad principle that the plaintiff is entitled, under such circumstances, to protection against the unauthorized use of its name. Such a use is conclusive evidence of the wrong which the law undertakes to redress, viz.: "The sale of the goods of one person as being those of another" (*Amoskeag Manuf. Co.*, agt. *Spear*, 2 *Sand. R.*, 599).

Now, if the defendants have not the right to use the plaintiff's name directly, they certainly have not the right to use it indirectly. For instance, in view of the evidence in this case, the defendants could no more rightfully call their prints "A. M. Co. prints," than they could style them "The Amoskeag Manufacturing Company prints;" because that would still be a representation, less full, pointed and direct, but none the less fraudulent, that the prints were of the plaintiff's production. "A. M. Co." is not merely a trade-mark, but a well-known, long used and thoroughly understood abbreviation of the plaintiff's name. So with the word "Amoskeag." It brings before the mind of the dealer in cotton goods not a mere geographical designation, but "The Amoskeag Manufacturing Company." He sees the full name of the company the moment his eye rests upon the distinctive part of it. To stamp the word "Amoskeag," therefore, upon cotton goods is substantially to represent (and that whether such be the intention or not, which is immaterial in applying the remedy [*Millington* agt. *Fox*, 3 *Myl. & Cr.*, 338]), that such goods are manufactured by the Amoskeag Manufacturing Company.

It was contended that the plaintiff's claim was practically of a monopoly in the word "Amoskeag." But not so. The word is free to those engaged in other and distinct lines of industry, because there its use conveys no such meaning as when applied to cotton goods. Whether such meaning is conveyed is a question of fact to be determined upon the evidence in each case. The manufacturer of cement, for instance, might apply the word "Amoskeag" to that article, because, when stamped upon cement, it would not stand for "The Amoskeag Manufacturing Company." *In that connection*, it would be a mere geographical designation (in which, *per se*, no one has an exclusive right until applied), and not, in effect, the plaintiff's name. Its use, consequently, would deceive no one, because it would not convey the idea, and, therefore, would not represent, that the cement was the plaintiff's production.

Applied, however, to any and every variety of cotton goods, whether such as the plaintiff has, or has not as yet, manufactured, it could not fail to indicate the plaintiff's name, and that the goods were of its manufacture.

If the word "Amoskeag" was not the distinctive part of the plaintiff's name, it might *be claimed*, as in the I. X. L. case, that its use upon a new variety in the same general line of goods did not necessarily indicate either the name or the manufacture. But if, in the "I. X. L." case, the mark had been the name of the manufacturer, or even if the letters "I. X. L." had been his initials, the examiner would doubtless have arrived at a different conclusion. Otherwise, a person preparing to embark in a particular line of industry would have to see to it, if he desired to be protected in the use of his name, or of an abbreviation well known to stand for his name, that his *earliest* productions covered every possible variety of goods in such general line.

The only difference between the parties on this head, is as to the legal treatment of the word "Amoskeag." The learned counsel for the defendant says "it is no part of our claim that Mr. Jones can use Mr. Baker's name on Mr. Jones' goods," and he adds, "if a baker puts forth a 'Boston' cracker and uses the name until it becomes a trade mark, it does not prevent another baker from putting out a 'Boston roll' or a 'Boston pie' or a 'Boston plum-pudding.'"

But now suppose that the plaintiff had received from the legislature of New Hampshire the name of "The Amoskeag Baking Company," and for forty years had been engaged in the humbler though hardly less useful avocation of "manufacturing" almost every variety of bread, roll, muffin, cracker, biscuit, cake and pie, on which articles of food it had invariably stamped its corporate name or some abbreviation thereof, such as "Amoskeag B. Co." or "Am. Baking Co." or "Am. B. Co." or "*Amoskeag!*" Suppose, however, that the plaintiff had omitted or had not yet decided to make and vend the single variety known as "crumpets," and thereupon

a rival baker attempted to sell his crumpets as " Amoskeag crumpets," would not any customer, upon seeing the name thus applied, naturally say that The Amoskeag Baking Company had added crumpets to its other varieties of bread ? And would not the rival bakery be restrained, upon the plain principle of an unauthorized use of the company's name. The parallel is not precise, as the printing of calicoes may require some additional machinery. But the difference is only in degree.

Looking at it in another point of view, can there be any doubt that if the defendants were incorporated under the name of " The Garner Manufacturing Company," and if the positions in this case were reversed, the present plaintiff would be restrained from styling its prints " Garner prints," and upon precisely the same principle ?

For surely no just distinction can be drawn from the fact of the distinctive part of the corporate name having originated in the one case with an individual, and in the other with a locality.

These considerations are independent of the special facts of the case. But the proof is abundant that the use of the word "Amoskeag " was an advantage to the defendants in the introduction and sale of their prints. For although the first purchaser of prints may test the quality, yet an old and well-established name in good repute would naturally call his attention to the goods, and would thus be worth to the seller more than a new and hitherto unknown name.

The defendants have never directly represented to purchasers that these Amoskeag prints were of the plaintiff's production, and there is nothing whatever in the case to justify the belief that they would have been capable of any such deceit. For aught that appears, they have acted upon the impression that as to cotton goods not manufactured by the plaintiff, they had a legal right to the name of "Amoskeag." Be that as it may, there is no doubt that "Amoskeag " was taken and adopted, because likely to facilitate the sale of the prints ; and

not only was the use of the name, as we have seen, under the circumstances, a representation, but, as a matter of fact, many persons were deceived thereby. It is true that these persons may not have scrutinized the labels with great care, and that, by proper inquiry, they might easily have ascertained who the printers were.

The criterion, however, is not the certainty of success in misleading the public, but, as was said by DUER, J., in *The Amoskeag Manufacturing Company* agt. *Spear*, its probability, or even possibility.

There is another fact which, of itself, might well have afforded ground for relief, and which ought to be adverted to. The plaintiff has never applied the name of Amoskeag to inferior, nor indeed to any but its best goods. Any thing less than the best has been sold under other names. Thus the plaintiff has built up a vast business, in which its name applied to goods has become synonymous with standard worth.

Now, the manner in which the defendants have made use of the word Amoskeag has been prejudicial to this reputation. At one time they applied it to prints that were not their best; then for some time to their best, and afterwards again reduced the grade. Thus the name of Amoskeag, as applied to prints, at times represented a certain inferiority; at other times, fluctuation, and, at all events, not that steady and invariable highest excellence to which it has been the effort of the plaintiff's business existence to see connected with its name. The effect of this upon the public may, in a degree, be judged by the remark made to Gov. Straw by a western dry-goods merchant: "How is it that your Amoskeag goods are so very good, with the exception of the prints, and why is it you make such devilish bad prints?"

For these reasons the defendants should be enjoined from using the name of "Amoskeag" upon their prints or calicoes, unless such relief should be denied to the plaintiff by reason of its laches.

Amoskeag Manufacturing Co. agt. Garner.

And this brings us to the second, and certainly not the least difficult, branch of the case. The English cases upon this head do not appear to be altogether harmonious.

In *Beard* agt. *Turner* (13 *L. T. R.* [*N. S.*], 747), vice-chancellor Wood held that a delay of two years was such laches as to disentitle the plaintiff to any relief whatever, while in *Harrison* agt. *Taylor* (11 *Jur.* [*N. S.*], 408), where the delay was but little less, he granted an injunction to restrain the use of the plaintiff's trade-mark, but refused an account of the profits because of the laches.

In the former case the general principle was stated that "if you induce another to lay out money by keeping back a right which you intend at some future time to assert, you may induce him to incur serious expenditures, * * * and * * * if you allow considerable expenditure to be made, you are not allowed afterward to question the title of the person who has made that expenditure." Upon this ground, had the facts warranted it, the injunction might well have been refused, but the vice-chancellor declared that the rule did not apply to the case before him, as the expenditure was insufficient. He then proceeded to consider another and entirely independent proposition, viz., that if you ask an account of the profits, you must come into court at once. Upon this, he not only denied the profits, but dismissed the bill, stating that upon the whole evidence, there was not that case of fraud made out which would justify any other result. It is difficult here to understand what legal sequence was drawn from the delay; for although this question is fully discussed, yet the dismissal of the bill in all its parts — that is, as to the injunction as well as the profits — is finally put upon another ground, and that, too, a ground which, understanding *actual* fraud to be meant, is scarcely tenable, for an injunction was allowed in *Millington* agt. *Fox* (*supra*), although a case of fraud in fact was not made out; also in *Harrison* agt. *Taylor* (*supra*), although the *scienter* was not proved.

The case is certainly somewhat confusing, and hardly an

authority for the extreme doctrine contended for with respect to laches. The better rule is that laid down in *Harrison* agt. *Taylor*, and it is the rule which has prevailed in this country.

In *The Amoskeag Manufacturing Company* agt. *Spear* (*supra*), DUER, J., remarked: " The consent of a manufacturer to the use or imitation of his trade-mark by another, may, perhaps, be justly inferred from his knowledge and silence ; but such a consent, whether express or implied, when purely gratuitous, may certainly be withdrawn ; and when implied, it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license. The existence of the fact may be a proper subject of inquiry in taking an account of profits, if such an account shall hereafter be decreed ; but even the admission of the fact would furnish no reason for refusing an injuction."

This was followed in *Gillott* agt. *Easterbrook* (47 *Barb.*, 455). There the infringement had proceeded for some twenty years. This was generally known to the plaintiffs, as appeared from his " caution," but it did not appear that he had " discovered any individual whom he could attack as an offender." Judge POTTER remarked that the legal effect of the evidence was : " First, that it is no defense that the fraud has been multiplied; second, that acquiescence cannot be inferred, and it is revocable, if it could be."

*Taylor* agt. *Carpenter* (2 *Wood & M.*, 1), was an action at law, and consequently the rule there laid down is not fully applicable. It is, however, instructive, as showing the views entertained upon this question by a court of law. After holding that a neglect to prosecute because one believed he had no rights or from mere procrastination, is no defense at law, except under the statute of limitations pleaded and relied on, or under some positive statute. WOODBURY, J., declares that " there is something very abhorrent in allowing such a defense to a wrong which consists in counterfeiting others marks or stamps, defrauding others of what had been

Amoskeag Manufacturing Co. agt. Garner.

gained by their industry and skill, and robbing them of the fruits of their good name, merely because they have shown forbearance and kindness."

In a case in equity, between the same parties (3 *Story*, 458), judge STORY took substantially the same views, and his opinion was approved of in *Coats* agt. *Holbrook* (2 *Sand. Ch. R.*, 586).

Judge WOODBURY's language was quoted with approval in *Filley* agt. *Fassett* (44 *Mo.*, 173, *an equity case*), and the rule stated in *The Amoskeag M. Company* agt. *Spear*, was reaffirmed in our own state (by the Albany general term of the supreme court) in *McCardel* agt. *Peck* (28 *How. P. R.*, 126), MILLER, J., using this language: " A person may, undoubtedly, consent to the employment of his name for such a purpose, but if such consent be purely gratuitous, or unless there is some valid agreement binding upon the party who thus gives such consent, it may be withdrawn at the pleasure of such party."

In the case at bar it is claimed that the plaintiff's laches extended over a period of nine years.

The proof upon this head, however, is somewhat vague, and certainly it is not of that clear and convincing character which would justify a court of equity in shutting its doors against the plaintiff and refusing any relief. Governor Straw, the plaintiff's agent, or manager at the works, says that all that was known upon the subject of infringement was the occasional receipt of a letter from some party contemplating a purchase of such prints, and that these letters were immediately forwarded to Messrs. Gardner, Brewer & Co., the selling agents of the company. He could not give the date when the first letter was received, but thought it was probably some ten years before his examination, which took place upon the 10th of December, 1875, though it might have been more. If he was correct about this it would indicate that the first notice was some time in the latter part of the year 1865, and as this suit was brought in April, 1869,

the delay would be reduced to something over three years. It is quite evident that the officers and employes of the company knew very little about the sale of the goods, and had few if any particulars respecting the infringements. Indeed, when governor Straw was interrogated as to whether he understood that the letters referred to "*Amoskeag prints,*" his reply was that " *he must have ; *" and he added: " I was so ignorant that some of our people put them on some class of goods. In fact, the manufacture of goods and sale of goods are distinctly separate, and there is very little connection with my business and the selling house."

Then the treasurer and agent of the company at Boston, testified that he first knew that the defendants were using the name "Amoskeag" about the time of the commencement of this suit, adding, however, " I don't mean to say that I may not very often have heard of it, but I left that entirely to the selling agents."

Mr. Brewer, one of the firm of Gardner, Brewer & Co., these selling agents, testified that he could not remember the date when he first heard that Garner & Co. were selling prints with the name "Amoskeag" upon them, but that it was not very long before the commencement of this action, but whether a year or six months or five years before, he could not answer with any degree of certainty, because his memory did not serve him in the matter.

Looking at all the testimony in the case, there can be no doubt that the plaintiff has exhibited a degree of inactivity, which would render it inequitable to compel the defendants to account for the profits. Further, it must be conceded that Gardner, Brewer & Co. probably knew from the beginning what was being done by the defendants, but that fact is not established. Neither upon the facts nor the law, therefore, has a case been made out which would justify a dismissal of the complaint. In the first place, there are none of the features of an estoppel. The plaintiff did not induce another to incur serious expenditure by keeping back a right, which

it intended at some future time to assert. Here the expenditure was confessedly limited to the mere printing of the labels.

In the next place, the plaintiff is not only seeking to injure the application of its trade-mark, but, as we·have seen, the unlawful use of its name. It might well be, in the case of a mere mark, that the court would say to the grossly negligent suitor : The question of your right to restrain the application of that mark to a variety of cotton goods, in which hitherto you have not dealt, is a sufficiently close one.

You have solved that question adversely to yourself, by your extreme laches. The question, really, is not whether your laches would prevent your obtaining relief against the application of your mark to goods in which you *have* dealt and on which you *have* stamped it. By not moving sooner, you have, in effect, admitted *that you never intended to apply that mark to the other variety*, and that its application thereto by another was a matter which did not concern you. But such a process of thought would be inapplicable to an effort like the present,.for laches can never have the effect of a concession that a person will not extend the use or the application of *his name*, nor càn it confer upon the wrong-doer the right to build up and establish a business in another's *name*.

There is still another reason, and that is, that the defendants will not suffer any considerable loss by refraining from the use of the word " Amoskeag." They have not built up any special business by its use. The term " Amoskeag prints " has no peculiar significance, as it has been applied by them. The fluctuations of its use have already been adverted to. If the defendants had consistently applied it to some one style of prints, until buyers had learned to purchase without examination, at least as to quality, there would be plausibility in the complaint on this head. But the fact is, that the defendants manufacture every year an immense quantity of prints to which, as may suit their convenience or the exigencies of their trade, they apply from time to time, quite a

number of different names.    Sometimes they drop old names and take new; again they apply old names to new uses and *vice versa*.  The point is the satisfactory disposition of the great bulk of their annual stock; it is immaterial under what names or tickets.  Even when the preliminary injunction in this case was served, its injury which  at the time was greatly exaggerated, consisted simply in the necessity for the removal of Amoskeag tickets and the sale of the goods under the defendants' own name.

This, too, is a sufficient answer to the suggestion, that should the plaintiff take advantage of the occasion to extend its industry to the production of calicoes, it would necessarily involve the appropriation "of the fruits of the defendant's industry, skill and capital."   On the contrary, the plaintiff would have to contend against and surmount the difficulties resulting from the manner in which the defendants have applied the word "Amoskeag," and it would probably secure the same high and steady position for its prints which it has for its other cotton goods, more readily and speedily if the defendants had never used the word.

There is, therefore, no just reason why the injunction, at least, should be refused upon the ground of laches.  It was properly refused *pendente lite*.  The plaintiff's case was not so clear as to warrant the interference of the court before the hearing upon the pleadings and proofs.  As to the correctness of that interlocutory decision, there can scarcely be two opinions; that is, as to the result.  Much of the reasoning upon the general merits of the case was unnecessary, and it certainly is not binding upon the special term, sitting to try the issues, especially as the facts fairly deducible from the testimony now before the court differ in many respects from what appeared in the *ex parte* affidavits read upon the motion.

There must, therefore, be judgment for the plaintiff, enjoining the defendants from the use of the word "Amoskeag," but without damages or account of profits, and, under all the circumstances of the case, without costs.