# CASES DETERMINED

IN THE

# ST. LOUIS COURT OF APPEALS,

## MARCH TERM, 1881.

---

H. H. SKINNER ET AL., Respondents, *v.* ANNIE OAKES ET AL., Appellants.

### March 8, 1881.

1. A conveyance good *inter partes*, made in fraud of creditors, can only be impeached by the creditors themselves.

2. Affidavits filed in support of a motion for a new trial will not, on appeal, be considered as evidence of anything affecting the merits of the case.

3. A man who voluntarily parts with the right to use his own name as a trade-mark cannot voluntarily recall it by marrying, and carrying on business in his wife's name; nor can she, by marrying him, acquire any higher right to use his name as a trade-mark than he himself had.

4. A trade-mark which consists of the name of a third person is not such a species of property as can be disconnected from the business with which such person was formerly connected, and sold from man to man.

5. Where the assignee of the naked right to use a trade name claims the exclusive right to sell goods bearing this name, he must show that the name was originally used to designate goods of a certain quality or description, and is being used by him to designate substantially goods of the same quality or description, and that the use of the name does not operate to deceive the public into the belief that the goods are made by the man whose name they bear.

6. Where goods are sold and delivered, but, owing to a secret contract, the right to a part of the thing sold is subject to be defeated, an innocent purchaser for value takes a title unaffected by the terms of the secret defeasance, of which, owing to the laches of the original vendor, he had no notice.

APPEAL from the St. Louis Circuit Court, BOYLE, J.
*Reversed and remanded.*

W. H. H. RUSSELL and DAVID MURPHY, for the appellants : The use of the word " Oakes " wrongs the appellants and is a fraud upon the public, and its use should be enjoined. — *Fetridge* v. *Wells*, 13 How. Pr. 387, 389, 394; *Leather Cloth Co.* v. *American Leather Cloth Co.*, 11 H. L. Cas. 544, 546 ; Upton on Trade-Marks, 26–53 ; *Carmichael* v. *Latimer*, 11 R. I. 407–410 ; *Little* v. *Page*, 44 Mo. 412 ; *Griffin* v. *Pugh*, 44 Mo. 326. " The good will of an establishment is an accessory thereto ; separate therefrom, it is of no value. And the same rule applies to trade-marks."— Upton on Trade-Marks, 27 ; 2 Pars. on Con. ( 6th ed.), side p. 378, 379 ; *Kidd* v. *Johnson*, 10 Otto, 620 ; *Churton* v. *Douglas*, 1 Johns. Eng. Ch. 176. A party is not entitled to use a proper name as a trade-mark, except in connection with some mark, symbol, or device, both of which must be in fact true ; and even then there can be no infringement of a trade-mark in the use of it, except by affixing it to articles manufactured or prepared by another, or so simulating it as to cause purchasers to be misled and deceived. — *Seixo* v. *Provezende*, L. R. 1 Ch. 192 ; Browne on Trade-Marks, sect. 361 ; *Partridge* v. *Menck*, Cox's Trade-Mark Cas. 80 ; *Corwin* v. *Daly*, Id. 265 ; *Canal Co.* v. *Clark*, 13 Wall. 323–326 ; 2 Pars. on Con. (6th ed.) 257 ; *Meneely* v. *Meneely*, 62 N. Y. 431 *et seq.*; *Fleming* v. *McLean*, 6 Otto, 252. A person who, in connection with his business, sells the right to use the *fac-simile* of his autograph as a manufacturer's mark, to be affixed to his goods, may, in the absence of a covenant restraining him from again engaging in the same business, at once engage therein, and in the same street, and even the next door, and use his own name.— *Canal Co.* v. *Clark*, 13 Wall. 323 ; *Churton* v. *Douglas*, 1 Johns. Eng. Ch. 176 ; *Crutwell* v. *Lye*, 17 Ves. 335 ; *Hall* v. *Barrows*, 10 Jur. (N. s.) 55 ; Williams on Pers. Prop. 258 ; *Howe* v. *Searing*, Cox's Trade-Mark Cas. 253. The agreement between Probasco and Oakes, either in its

several parts or as an entire contract, shows the intent of the parties to be that the use of the name " Oakes' Candy " was limited to Probasco as a personal license or privilege only; that in consideration of the continuation of Oakes as the manufacturer, its use was lawful; but not after that connection ceased, or, at the farthest, after Probasco abandoned the business and the establishment ceased to have an existence. And it matters not whether this determination of the license or privilege was the result of the agreement or by operation of law. — Upton on Trade-Marks, 80; 2 Pars. on Con. (6th ed.), side p. 664; Curtis on Pat. 197; *Kidd* v. *Johnson*, 10 Otto, 618; *Howe* v. *Searing*, Cox's Trade-Mark Cas. 244.

DRYDEN & DRYDEN, with HARRIS BALDWIN, for the respondents : It is competent for a person to so sell his name as to deprive himself of the right to use it in his own business, and to give that right to another. — *Probasco* v. *Bouyon*, 1 Mo. App. 244; *Stonebreaker* v. *Stonebreaker*, 33 Md. 257, 268; Cox's Trade-Mark Cas. 596; Codd. Dig. of Trade-Marks, sect. 611; *Ayer* v. *Hall*, 3 Brews. 512, 513; *Dixon Crucible Co.* v. *Guggenheim*, 2 Brews. 330–332. Peter Oakes has not, nor have he and his co-defendants combined, the right to the name " Oakes " in the manufacture and sale of candy in this city, because he has bound himself by a valid agreement to abstain from its use in that connection. — *Probasco* v. *Bouyon*, 1 Mo. App. 246; *Crutwell* v. *Lye*, 17 Ves. 346. If a substantial part of a trade-mark has been pirated, relief will be granted. *Filley* v. *Fassett*, 44 Mo. 178. If the trade-marks are simulated in such manner as will probably deceive customers or patrons, the piracy will be checked at once by injunction. — *Churton* v. *Douglas*, 1 Johns. Eng. Ch. 184; *Clark* v. *Clark*, Cox's Trade-Mark Cas. 206; *Brooklyn White-Lead Co.* v. *Masury*, Id. 210; *Bradley* v. *Norton*, Id. 331.

THOMPSON, J., delivered the opinion of the court.

This was a suit in equity to restrain an alleged piracy of certain trade-marks, and for an account. It appears that prior to May 17, 1869, Hiram S. Probasco and the defendant Peter Oakes were partners, in St. Louis, engaged in the manufacture and sale of candies. On that day they dissolved partnership, Oakes selling out to Probasco, by a contract of sale duly acknowledged and recorded, which conveyed to Probasco, his executors, administrators, and assigns, all of the Oakes interest in the partnership assets, and " also the good-will of the business and name of the firm of Probasco & Oakes, and the exclusive right to make and sell Oakes' candy, and to use the name thereof;" the contract further reciting, " it being the intent hereof to convey to said Probasco all my interest in all the property and assets of said firm of Probasco & Oakes, and all the franchises thereof."

This statement of the facts brings us to the point in the history of these transactions in which the rights of Probasco under the contract were determined in this court, in the suit of *Probasco* v. *Bouyon*, 1 Mo. App. 241. The rights there declared to exist in Probasco under this contract are the same rights claimed by the plaintiffs in this suit, derived, as is alleged, from Probasco, by two subsequent sales and transfers. It was there adjudged that by the above instrument of sale Probasco acquired the rights of the previous firm of Probasco & Oakes to the use of the name of " Oakes " in the manufacture and vending of the candies which Probasco & Oakes had previously manufactured and sold under that name. It was also held that Oakes could so sell his name as to deprive himself of the right to use it for his own manufacture, and give that right to another, under the circumstances of the case as shown in evidence. It was further held, that " Oakes may make and sell candy, but not under the name, the use of which he has, for this purpose, sold. He may make and

sell the very same candies, and is not obliged to conceal the fact that they are made and sold by him ; but he may not, in St. Louis, advertise them, either by sign over his shop door, or by label on the boxes in which they are packed, or in any other general and public way, as Oakes' candies.''

We are not asked to review this decision, or to modify it ; if we were, we could not do so consistently with well-settled rules of law, adherence to which is of the very highest importance. That decision, not having been reversed by a higher tribunal, is not only a rule of property generally, for the government of other like cases, should any arise, but it is in a peculiar sense the law of this particular case. It is a solemn adjudication of the rights of Probasco under the contract in question, on the faith of which the two sales under and by virtue of which the plaintiffs claim must be taken to have been made, for they were both made subsequently to its rendition. The books abound in cases which would support the conclusion reached by this court in that case, could it be reopened for controversy.

On the twenty-eighth day of May, 1877, after the rights of Probasco in the premises had thus been settled by this court, he sold out the business to W. J. Hammon, and executed to him a separate bill of sale, in which he undertook to convey to him, and, if the instrument is good, did convey to him, the trade-mark, name, good-will, and reputation connected with the manufacture, production, and sale of certain candies and confections, commonly known and called '' Oakes' Candies,'' '' Oakes' Home-Made Candies,'' and '' Oakes' Pure Home-Made Candies,'' reciting that such trade-mark, name, good-will, and reputation had been theretofore purchased by him from Peter Oakes, and concluding with the words, '' I hereby sell and convey to said W. J. Hammon all the rights and privileges connected, as aforesaid, with said candies and confections, which I may have. or did at any time derive from said Peter Oakes.''

An attempt was made, under objection, to prove that this was not a *bona fide* sale, but merely a fraudulent conveyance, designed to hinder and delay the creditors of Probasco. This evidence should have been excluded; but its admission worked no harm to the plaintiffs, for the court, in finding the issues in their favor must have disregarded it. It was wholly immaterial that this conveyance may have been made to hinder, delay, and defraud the creditors of Probasco. It is well settled that a conveyance in fraud of creditors can only be impeached by the creditors themselves. It is good as between the parties and their privies. As no creditors of Probasco, nor any one claiming rights under such creditors of Probasco, are before the court complaining of this sale, it is as good, for the purposes of this suit, as though Hammon had purchased of Probasco *bona fide*, and at full value.

A question of more importance is presented in a fact which did not appear in the suit of *Probasco* v. *Bouyon*. On the same day (May 17, 1879) that Oakes executed and delivered to Probasco the bill of sale above quoted from, a further agreement was entered into, on a separate sheet of paper, between Oakes and Probasco, delivered to Oakes and retained by him, and never recorded, which provided that Oakes should work for Probasco for two years at manufacturing candy, at a stated salary, and which also contained this provision : "And the said Probasco, on his part, covenants with the said Oakes, that should he, said Probasco, sell out his said business of candy making and selling within said two years, or at any other time, then said Oakes shall be released from all obligations under this agreement, and the right and privilege of making and selling ' Oakes' Candy' and of using said name ' Oakes,' shall revert to said Oakes."

The testimony is, that when Probasco sold to Hammon the rights in reference to " Oakes' Candy " which he had acquired from Oakes under the contract of May 23, 1877,

Hammon had no knowledge of this agreement, and that when Hammon undertook to sell the same rights to Skinner, Skinner had no knowledge of it. The affidavit to the contrary that Oakes filed, on motion for a new trial, is not evidence, for reasons which will be stated hereafter. The position of the defendants, as we understand it, is that these two contracts, the bill of sale, and this agreement made on the same day between Oakes and Probasco, were parts of the same contract, relating to the same subject-matter; that they are to be taken and construed together, and treated as though they had been drawn up on the same piece of paper and embodied in one instrument; that the operation of these two instruments was no more than to convey to Probasco a right in the manufacture and sale of "Oakes' Candy" personal to himself, and which he could not convey to another; that Probasco could not convey to Hammon, nor Hammon to Skinner, any higher rights than Probasco in fact acquired from Oakes under the two instruments, taken together; and that, by the terms of the agreement, whenever Probasco should undertake to sell his rights under the contract, they should revert to Oakes. And it is urged that the effect of these two instruments was nothing more than to make a conditional sale of the right to manufacture and vend "Oakes' Candy," so as to bring the case within the rule laid down in the following cases by the Supreme Court of this State: *Parmlee* v. *Catherwood*, 36 Mo. 480; *Little* v. *Page*, 44 Mo. 412; *Griffin* v. *Pugh*, 44 Mo. 326, and *Ridgeway* v. *Kennedy*, 52 Mo. 24.

These cases are not authority for the position taken. They go no further than to hold that where personal property is sold and delivered upon an agreement that the title is not to pass *until the purchase-money is paid*, until that condition is performed, the vendor, if guilty of no laches, can recover it from an innocent purchaser of the vendee. This rule, it may be observed, was found so productive of fraud, so injurious to innocent purchasers, and of such a

tendency to obstruct the free transfer of personal property, that in 1877 it was repealed by the Legislature.   1 Rev. Stats., sect. 2505.   It was, however, a rule of property at the time the sale of Oakes to Probasco was made ; and if we could see that it governed the contract in question, we should not hesitate so to declare.   But there is a wide distinction between a sale which is made conditional upon the payment of the purchase-money, and a sale — such as the one in question — where the purchase money is paid, the vendee put in possession, and allowed to remain in such possession for a long time, but where his right to a part of the thing sold is subject to be defeated by an event which may never occur, under a secret contract not embodied in the recorded bill of sale or known to the subsequent purchaser. If we look to the equities of the case, there can be no room for argument.   Oakes should have been more careful to put this contract of defeasance in the bill of sale itself, or else to notify Hammon and Skinner of it before they purchased.   If we look simply to the authority of the cases just cited, they do not govern ; for there the title did not pass to the vendee, while here it did pass.

It is seriously urged in the defendants' supplemental brief, that it is shown by the affidavits of Oakes and Sickles in support of the defendants' motion for a new trial that Hammon was personally served with a written notice of this agreement, in August, 1877, just after the sale of Probasco to Hammon.   It is scarcely necessary to suggest that no *ex parte* affidavit filed in support of a motion for a new trial can be looked to as evidence of anything affecting the merits of the case.   Parties must produce their testimony in such a manner as to afford the other side the right of cross-examination.   Affidavits in support of a new trial, when they relate to matters which may have materially affected the rights of the party moving for the new trial, and which do not appear on the records of the court, and are unknown to the court itself, are admissible.   That a party

has been surprised by testimony introduced against him, or that he has discovered new evidence on a material point, or that a juror has been guilty of misconduct, are instances of this. But we know of no rule of practice under which a party can be permitted to file affidavits of matters directly affecting the merits of the case and the issues which have been tried, of which he might have introduced evidence at the trial, so as to make them evidence to overthrow the judgment which has been rendered. The affidavits of Oakes and Sickles should have been stricken from the files. But even if these affidavits were evidence, they would have no effect, for they merely show that *after* Hammon bought the rights in controversy from Probasco he was notified of the secret agreement. This, therefore, would not affect his title, nor prevent him from conveying a good title to Skinner, even though Skinner, at or before his purchase of the right, had known of the agreement.

A point is made in behalf of the defendant Annie Oakes, that before the plaintiffs acquired the alleged right to use the name of Oakes in the manufacture of candies, she, by marrying with Oakes, had acquired a right to use his name in the same connection, of which the plaintiffs cannot lawfully deprive her. There is nothing in this point except novelty. Peter Oakes could not confer upon Annie McLaughlin, by marrying her, any higher rights in the use of his own name than he himself had. A son cannot acquire from his father the right to use his father's name as a trade-mark, if the father had parted with the right by contract (*Filkins* v. *Blackman*, 13 Blatchf. 440), and we do not see how a wife could stand in a better position as to the name of her husband.

There remain two questions in the case, either of which is of more serious import. There is nothing in the record to show that Hammon sold to Skinner any property whatever, except the naked right to use the trade-marks in question. The first question therefore is, whether a trade-

mark which consists of the name of a third person is such a species of property that it can be disconnected from the business with which such person was formerly connected, and sold from man to man. The second is, whether the use of the name of the third person in such a way does not involve such a fraud upon the public as will prevent a court of equity from protecting it.

1. The first question cannot be answered intelligibly without some consideration of the grounds upon which courts of equity proceed in protecting trade-marks.

The principle on which all the cases on the subject of trade-marks unite is, that one man will not be permitted, by imitating the distinctive name or mark used by another person to designate articles of the latter's manufacture, to impose articles of his own manufacture upon the public as the articles of the former. The cases so holding rest upon two considerations: First, that it would be a fraud on the rights of the former person thus to permit his trade-mark to be imitated; second, that it would also be a fraud on the public. See *Gilman* v. *Hunnewell*, 122 Mass. 139; *McLean* v. *Fleming*, 96 U. S. 245, 251; *Colman* v. *Crump*, 70 N. Y. 573; *Fairbanks* v. *Jacobus*, 14 Blatchf. 337; *Devlin* v. *Devlin*, 67 Barb. 290; *Amoskeag Man. Co.* v. *Garner*, 54 How. Pr. 297; *Curtis* v. *Bryan*, 2 Daly, 312; *s. c.* 36 How. Pr. 33; *Amoskeag Man. Co.* v. *Spear*, 2 Duer, 607; *Peterson* v. *Humphrey*, 4 Abb. Pr. 394; *Howe* v. *Howe Machine Co.*, 50 Barb. 236; *Sykes* v. *Sykes*, 3 Barn. & Cress. 541; *Burgess* v. *Burgess*, 3 De G. M. & G. 896, 904; *Burke* v. *Cassin*, 45 Cal. 467; *Emerson* v. *Badger*, 101 Mass. 82; *Ellis* v. *Zeilin*, 42 Ga. 91; Lord Kingsdown, in *Leather Cloth Co.* v. *American Leather Cloth Co.*, 11 H. L. Cas. 538; *Perry* v. *Truefitt*, 6 Beav. 66; *Walton* v. *Crowley*, 3 Blatchf. 448; *Dixon Crucible Co.* v. *Guggenheim*, 1 Cox's Trade-Mark Cas. 559.

The courts have proceeded upon the twofold principle, that the public have a right to know that goods which bear the sig

nature or mark of a particular manufacturer or vendor are in fact the goods of such manufacturer or vendor, and that the manufacturer or vendor of such goods has a right to any advantage which may accrue to him from the public knowing that fact. *Congress Spring Co.* v. *Rock Spring Co.*, 45 N. Y. 291; *Glenn & Hall Man. Co.* v. *Hall*, 61 N. Y. 226, 229. In the early English cases it was laid down that courts of equity, in protecting trade-marks, proceed on the idea of fraud, and not on the idea of property; and this doctrine found its way even into a recent decision of Sir W. Page Wood (Lord Hatherley). *Collins Company* v. *Brown*, 3 Kay & J. 426. But, upon whatever idea the courts proceeded, as soon as their decisions established in a particular individual a right, exclusive as against the world, to use a particular label or a particular advertising device whereby trade was attracted to him, that right at once became a thing of value, and hence property, in a sense more strict than that in which many other incorporeal rights, such as the elective franchise or the right of presentation to a vacant benefice, have been regarded as property. Moreover, the courts' of chancery were often appealed to, successfully, to enjoin the infringement of trade-marks in cases where no fraud was intended, and where the relief could hence be granted only on the idea of property. Accordingly, it has become a settled doctrine of the English and American courts that trade-marks are protected, not exclusively on the ground of fraud, but also on the ground of property. *Hall* v. *Barrows*, 4 De G. J. & S. 150, 158; *Filley* v. *Fassett*, 44 Mo. 168, 177; *Gilman* v. *Hunnewell*, 122 Mass. 139; *Ainsworth* v. *Walmsley*, L. R. 1 Eq. 518; *Maxwell* v. *Hogg*, L. R. 2 Ch. App. 314.

There are some *quasi*-proprietary rights, such as the elective franchise, which are incapable of assignment. But it would be obviously unjust so to restrict the right to use a trade-mark. The advantages which accrue from the use of a particular trade-mark or advertising device are often

the result of a lifetime of integrity, skill, perseverance, and business capacity.   Ought it to be held that a right so valuable snould die with the person who created it, it being incapable of assignment, when, by reason of age, or other considerations, he might desire to cease using it?   The custom of trade, which solves many questions in advance of the courts, has declared that this should not be ; and the courts, in adopting the view that the right to use a trademark is assignable, did no more than declare a result which followed from the concession that it was property ; for the *jus disponendi* is embodied in the very idea of property.   It is hence settled law that the right to use a trade-mark is not a mere personal privilege, but that, within certain limits, it is capable of being bought and sold as other property. "A trade-mark," says Strong, J., " like the good-will of a store or manufacturing establishment, is a subject of commerce, and it has been many times held entitled to protection at the suit of vendees." *Fulton* v. *Sellers*, 4 Brews. 42.   See also *Bury* v. *Bedford*, 33 L. J. (Ch.) 465 ; *Hall* v. *Barrows*, 33 L. J. (Ch.) 204 ; *Glenn & Hall Man. Co.* v. *Hall*, 61 N. Y. 226 ; *Peltz* v. *Eichele*, 62 Mo. 171.

A trade-mark may, and often does, consist in the name of a person or partnership firm ; and the exclusive use of such trade-mark is upheld, with this limitation, that another person of the same name is not to be prevented from using his name in the same way, provided there are no special circumstances which make it inequitable for him to do so. *Meneely* v. *Meneely*, 62 N. Y. 427 ; *Wolfe* v. *Burke*, 7 Lans. 151 ; *Probasco* v. *Bouyon*, 1 Mo. App. 241.

But where the trade-mark consists of a name, how far it is capable of assignment is a more difficult question.   We think that the answer to this question depends upon the effect which the use of the name in each particular instance is shown to have upon the minds of the public.   If it leads the public to believe that the particular goods are, in fact, made by the person whose name is thus stamped upon them,

or in whose name they are advertised, whereas they are, in fact, made by another person, then such a use of the name will not be protected by the courts; for to do so would be to protect the perpetration of a fraud upon the public. Thus, if an author were to assign to another the privilege of publishing books with his name upon their title-page, or if a painter were to sell to another the privilege of placing the former's signature on pictures painted by the latter, it cannot for a moment be supposed that any court would protect such a supposed right, even as against the original assignor. This point is absolutely clear, both upon principle and authority. *Leather Cloth Co.* v. *American Leather Cloth Co.*, 11 H. L. Cas. 523, 534, 544; *Samuel* v. *Berger*, 4 Abb. Pr. 88.

But there are many cases where the courts uphold the use of a name as a trade-mark, trade-name, or advertising engaged in the trade, and although in order to do so it is necessary to enjoin the person whose name is so used, from a similar use of the name. These cases, so far as I have been able to discover and classify them, are twofold: First, where the business is sold together with the good-will thereof, in which case, either by the usages of trade or by the express contract of the parties, the name passes with the business to the assignee. In such cases, in view of the courts, no deception is, in fact, practised upon the public; since, in conformity with the usages of trade, the names used in the style of a business firm are not understood by the public as necessarily implying that persons of that name are actually members of the firm. Such was the case of *Churton* v. *Douglass*, Johns. Eng. Ch. 174, where John Douglass, of the firm of John Douglass & Co., having sold out his interest in the property and good-will of the firm, was enjoined from taking in other partners and setting up a similar business near the old place, under the same firm-name of John Douglass & Co. Such, also, was *Dixon Cru-*

*cible Company* v. *Guggenheim*, 2 Brews. 321; *s. c.* 1 Cox's Trade-Mark Cas. 559; and such was this case, as it stood between Probasco and Oakes, as will be seen by reference to *Probasco* v. *Bouyon*, 1 Mo. App. 241. Some courts, indeed, have gone so far as to assimilate a trade-mark to the species of property known as good-will, insomuch as to hold that it is not vendible except as a part of the establishment or business with which it was originally connected. *Leather Cloth Co.* v. *American Leather Cloth Co.*, *supra; Witthaus* v. *Mattfeldt*, 44 Md. 303, 306.

But it is obvious that it cannot in all cases be so restricted; for there is a second class of cases, where the name is merely used as an adjective to identify goods of a particular description, or articles which embody a particular result in chemistry or manufacture. In these cases, the right to use the name may be sold in connection with what is called the right to manufacture and vend the goods. But since there can be no exclusive right in any one to manufacture or vend goods which are not patented, such a contract of sale amounts to nothing more than that the vendee may, if he chooses to make the same goods, call them by the name of the original inventor or maker, and that such inventor or maker will not in any manner obstruct him in so doing. To this class of cases belong those cases which uphold the exclusive right to make and vend a proprietary medicine which has become known by the name of the vendor. *Fulton* v. *Sellers*, 4 Brews. 42; *Filkins* v. *Blackman*, 13 Blatchf. 440; *McLean* v. *Fleming*, 96 U. S. 245, 251. In these cases, the name thus used is but an adjective of quality or description, which is not understood by the public as a warranty that the person who bears the name is maker of the article, but only that the article is made after the same formula as when he made it. Upon the same principle, where a hotel or theatre bears the name of one who has owned or occupied it, and has been sold out or leased by him under that name, he cannot enjoin a subsequent

purchaser or lessee from calling it by his name. *Booth* v. *Jarrett*, 52 How. Pr. 169. See also *Willington* v. *Fox*, 3 Myl. & Cr. 333.

These distinctions have been clearly presented by the Supreme Court of Rhode Island in *Carmichel* v. *Latimer*, 11 R. I. 395, 401, where Potter, J., after examining many cases with a view of determining whether a trade-mark is assignable, says : "Upon this question there has been a great variety of decisions, and it is difficult to reconcile them. A proper classification of the cases would probably remove some of the difficulty. Where, from its being a peculiar invention, a secret process, or particular mode of manufacture not generally known to the public, the knowledge of the process might be communicated to others, and the public and the purchasers should be protected against imitations. This circumstance would give a value to the process, and assimilate it to the nature of property which might be disposed of. In some of the cases there has been a question between partners, or there has been a sale of the business, to be continued by the vendee, and more or less connected with the place and the good-will of the business ; and in many of these cases the sale of the trade-mark would be upheld. So where the name denotes the product of a particular property — *e. g.*, 'Congress Spring,' or wine made from a particular vineyard. In such cases there is no property in the words, but only as the means of designating a property. But where the reputation of the goods and of the name has grown out of the excellence of manufacture, depending on the honesty and skill of the maker, it is more difficult to hold that it can be sold to a stranger, or that it is generally assignable."

So, in the case before us, if we could gather from the record that the plaintiffs are the successors in business of Probasco & Oakes ; that they had become the assignees, not merely of the trade-marks and tokens, but also of the establishment and the business, so that they are really

carrying on the same business and manufacturing and selling the same goods as Probasco & Oakes, we should have no difficulty in holding that they are entitled to the relief which the court below awarded them. But, so far as we can gather from the record, they stand before us as the naked assignees of certain trade-marks and tokens which were used by the originators of them in the sale of candies, and they claim the general right to sell candies by means of these trade-marks and tokens. This claim can only be supported by alleging and proving that these marks and tokens were originally devised and used to designate goods of a certain quality or description, and that they are, in fact, using them to designate goods of substantially the same quality or description. *Filkins* v. *Blackman*, 13 Blatchf. 440.

Neither can they, under the circumstances in which they present themselves to the court, uphold the right to use the name of Oakes in the vending of candies, without making it clear that it is a mere adjective of description, indicating to the public that the candies so marked or advertised are of a certain kind or quality, and that the use of such a name does not operate to deceive the public into the belief that they are, in fact, made by the man Oakes. We cannot gather from the record that they have made these facts to appear, and we must accordingly reverse the judgment and remand the cause.

We have given to this case long and anxious attention, and have considered attentively many decisions bearing upon the subject which we have not thought it necessary to cite. We have done this, not only because it involves important rules of property, but also because questions of public right and public policy enter into it, which courts of justice cannot ignore. We are disposed to uphold the assignability of trade-marks, trade-names, and the good-will of trading establishments, as far as authoritative courts have hitherto gone. But we cannot go to the wild length

of holding that the name of a man may be segregated from the man himself, and from the business in connection with which the man has used it, erected into an ideal and abstract species of property, be made a subject of traffic and sale in the market from man to man, to be used in any manner in which the purchaser may choose to use it.  In so far as the name of Oakes may have been used to designate candies of a particular kind and quality, the plaintiffs may have acquired a right thus to use it, which they may, on a subsequent trial, be able to show; but in so far as it represents to the public the personal skill and integrity of the man Oakes, the right to use it cannot, under any circumstances, become the property of a person bearing another name.

Reversed and remanded.   All the judges concur.