## CELLULOID MANUF'G CO. *v.* READ.

*(Circuit Court, D. Connecticut. October 7, 1891.)*

**1. TRADE-MARKS—WHAT WILL BE PROTECTED.**
The word "Celluloid," being a new and arbitrary word coined by plaintiff, and applied to goods of its manufacture, is a valid trade-mark, in the use of which plaintiff is entitled to be protected, though the term has become so generally known as to have been adopted by the public as the common appellative of the article to which it is applied.

**2. SAME—WHAT CONSTITUTES INFRINGEMENT.**
But the use of the term by defendant as applied to an article of his manufacture, "Celluloid Starch," is not such as to induce the public to believe that the starch was connected with plaintiff or a product of its manufacture, and hence it is not an infringement of its trade-mark entitling plaintiff to an injunction.

**3. SAME—INJUNCTION.**
The fact that a method might be devised by which plaintiff's article, "Celluloid," could be converted into a substitute for starch, and the possibility that it may in the future desire to make such an article, and put it on the market, are too remote to entitle it to an injunction against such use of the term by defendant.

In Equity.
*Rowland Cox*, for plaintiff.
*Henry G. Newton* and *Henry F. Hall*, for defendant.

SHIPMAN, J. This is a bill in equity for an injunction against the unlawful use of a trade-mark. The plaintiff was incorporated in 1871, by the name of the "Celluloid Manufacturing Company," for the manufacture and sale of "celluloid, or solid collodion, and its compounds, and articles made therefrom;" and ever since has existed under said name, has been constantly engaged in said manufacture, and has done an extensive business in producing a great variety of articles of use or ornament which contained, in whole or in part, the substance called "Celluloid." About the year 1870 the Messrs. Hyatt invented and patented a process for the conversion and manufacture of pyroxyline into a solid, to which, after the manufacture had developed and been materially improved, they gave the arbitrary or fanciful name "Celluloid," a name which has ever since been applied to the article, as manufactured by the plaintiff, which apparently succeeded to the trade-mark rights

and became the owner of many of the patents of the Hyatts. The substance has had a wide reputation and popularity on account of its beauty and utility, and the great number of uses of varied character to which it can be adapted. It has been extensively used for the outside portion of collars and cuffs, whereby these articles became impervious to water, and retained the smoothness and glossiness of highly starched linen; but celluloid cuffs are easily distinguished from starched linen cuffs. Celluloid has never been used as a starch, or as a substitute for starch, unless the manufacture of collars and cuffs may be deemed to be such, and there was no testimony that the plaintiff looked forward to its use as starch. The learned scientific expert for the plaintiff testified that it seemed to him not only chemically possible, but highly probable, that a method might be devised by which celluloid, as manufactured at present, could be converted into a starch-like body, fit for use as a substitute for starch, and very possibly presenting modified properties which would render it superior to ordinary starch, and more desirable for such use. The plaintiff has manufactured lacquers and varnishes containing pyroxyline, and an ink to which it gave the name "Celluloid Ink," which did not contain pyroxyline. The defendant, under the name of the "Celluloid Starch Company," is manufacturing and selling a powdered laundry starch, which he calls "Celluloid Starch," and which he presents to the public in packages containing labels which call it by that name, and represent that the article is a new one, and possesses valuable properties, and is "the latest practical invention of the times." It is, simply, prepared starch, and has nothing in common with celluloid, as heretofore used and developed, though cellulose and starch in ultimate chemical composition are alike. The complainant alleges in its bill that the complete preservation of the identity of its corporate name is a matter of very great consequence to it, as affecting the good-will of its business, its custom, its credit in the market, and the reputation of its goods, and that it has an exclusive right to the use of its name, and to the use of the designation "Celluloid" as a trade-mark or trade name, and that there can be no lawful use of the word "Celluloid" as a trade-mark except in connection with the sale or use of its products. The bill further alleges that the defendant's use of the word "Celluloid" must cause his article to be received by the public as an article made by the plaintiff, or as one containing its product, and that his use is an injury to the plaintiff, and unlawful, because it has the effect to exclude the plaintiff from the enjoyment of its right to use its trade-mark upon a class of articles, to-wit, starches and coatings of different kinds like those upon collars, other examples of which it may at any time produce, and prays for an injunction.

The first important question in the case has been settled, so far as this court is now concerned, by the decision of Mr. Justice BRADLEY in *Celluloid Manuf'g Co.* v. *Cellonite Manuf'g Co.*, 32 Fed. Rep. 94. The Cellonite Company was manufacturing, under the name "Cellonite," the same article which the Celluloid Company had long manufactured, and which the corporation of the Cellonite Company had previously manufactured under the name "Pas bosene." The plaintiff's bill prayed for an injunction against the use of the name "Cellonite," upon the ground

that it was an unlawful infringement of the plaintiff's trade-mark. The defendant in that case insisted that, inasmuch as the word "Celluloid" is now a word in common use, and signifies a well-known article, and is an appellative to designate the substance "Celluloid," it cannot therefore be used as a trade-mark. Mr. Justice BRADLEY, after remarking that it was true, as a general rule, that a word merely descriptive of the article to which it is applied cannot be used as a valid trade-mark, said:

"If the rule referred to were of universal application, the position of the defendant would be unassailable. But the special case before me is this: The complainant's assignors, the Hyatts, coined and adopted the word when it was unknown, and made it their trade-mark, and the complainant is assignee of all the rights of the Hyatts. When the word was coined and adopted it was clearly a good trade-mark. The question is whether the subsequent use of it by the public, as a common appellative of the substance manufactured, can take away the complainant's right. It seems to me that it cannot."

The justice, after quoting with approbation the conclusion of the New York court of appeals, as stated by Judge RAPALLO in *Selchow* v. *Baker*, 93 N. Y. 59, said:

"I think it perfectly clear, as matter of law, that the complainant is entitled to the exclusive use of the word 'Celluloid' as a trade-mark."

Judge RAPALLO's clear statement of the conclusion of the court of appeals was as follows:

"Our conclusion is that where a manufacturer has invented a new name, consisting either of a new word or a word or words in common use, which he has applied for the first time to his own manufacture, or to an article manufactured by him, to distinguish it from those manufactured and sold by others, and the name thus adopted is not genuine, or descriptive of the article, its qualities, ingredients, or characteristics, but is arbitrary or fanciful, and is not used merely to denote grade or quality, he is entitled to be protected in the use of that name, notwithstanding that it has become so generally known that it has been adopted by the public as the ordinary appellation of the article."

The next and remaining question is whether the defendant's use of the complainant's trade-mark is such an unlawful use that it should be restrained. To answer this question, the extent of the owner's property in a trade-mark, and the character of the act which is held to injuriously affect his property rights, and to call for the interposition of a court of equity, must be ascertained. The office of a trade-mark and the extent of property in its use have been, of late, frequently discussed by the supreme court, and the definitions which were stated by Mr. Justice STRONG, in *Canal Co.* v. *Clark*, 13 Wall. 311, have been universally approved and confirmed. The learned judge, after saying that "the office of a trade-mark is to point out distinctively the origin or ownership of the article to which it is affixed, or, in other words, to give notice who was the producer," said:

"Where rights to the exclusive use of a trade-mark are invaded, it is invariably held that the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another, and that it is only when this false representation is directly or indirectly made that the party who appeals to a court of equity can have relief."

To the same effect, Judge BRADLEY said, in *Celluloid Manuf'g Co.* v. *Celloruite Manuf'g Co.*, *supra:*

"The essence of the law of trade-marks is that one man has no right to palm off, as the goods or manufacture of another, those that are not his. This is done by using that other's trade-mark, or adopting any other means or device to create the impression that goods exhibited for sale are the product of that other person's manufacture, when they are not so."

This use must be of such a character as to induce the belief on the part of the public that the goods which are sold are of the plaintiff's manufacture, and to cause danger that either the plaintiff will be injured or the public will be deceived. The deceit of the public, and the consequent injury to it, are as much to be regarded by a court of equity as an injury to a plaintiff's business. It therefore follows that the right of an owner of a trade-mark is not a right to its exclusive use everywhere and under all circumstances. He cannot prevent its use when the use is entirely innocent, and represents nothing in regard to the plaintiff's connection with the goods, and does not impose upon the public. Thus it has been said that an iron manufacturer who uses a lion's head as a trade-mark cannot prevent a linen manufacturer from using a lion's head upon his goods. *Ainsworth* v. *Walmesley*, 35 Law J. Ch. 352. But it does not follow that because a manufacturer never made a particular class of goods his trade-mark can be impressed by another manufacturer upon that particular class, which is akin to the articles in the manufacture of which the owner of the trade-mark made his reputation and made his mark of value. Thus the Collins Company, a corporation which had, by its charter, a right to manufacture all articles of metal, had, from 1834, a valuable trade-mark which it used upon edge tools, picks and hoes, but did not, before 1856, make a digging tool, such as the shovels upon which, in 1856, its rival placed the Collins Company's trade-mark. The claim that the defendant could appropriate the Collins Company's well-known trade-mark upon shovels, and obtain a right thereto, prior to that of said company, upon shovels, was justly regarded as unsound. *Collins Co.* v. *Ames, etc., Corp.*, 20 Blatchf. 542, 18 Fed. Rep. 561. To the same effect is *Manufacturing Co.* v. *Garner*, 54 How. Pr. 297. It is plain to perceive that, in the extreme case of the lion's head, there would be no injury, while in the shovel case there was a palpable injury by the unlawful appropriation of the trade-mark. Between these two extreme cases the circumstances may be very varied, and oftentimes it will be difficult to determine whether the appropriation of another's trade-mark is an injurious theft or is a harmless use. An example of this difficulty is found in *Eno* v. *Dunn*, L. R. 15 App. Cas. 252. Dunn sought to register, as a trade-mark, the words, "Dunn's Fruit Salt Baking Powder." Eno opposed the application, because he had used the designation "Fruit Salt" for a powder used for producing an effervescing drink. This powder had acquired a high reputation and popularity. There was testimony from four persons that the Eno article had been used, in exceptional cases, as a baking powder. The only question was whether the proposed use of the term "Fruit Salt" would be calculated to deceive the public. The burden of proof is upon the applicant for registration under the En-

glish statute to show that his trade-mark is not calculated to deceive. Three of the five judges thought that the use would have such danger. Their opinion was to the effect that the words "Fruit Salt" "were calculated, and I think designed, to create a confusion in the minds of those persons to whom Mr. Dunn's advertisement was addressed, and to lead the ordinary run of such persons to suppose that his baking powder is in some way connected with Mr. Eno's preparation." But there was unanimity in the idea that the property of Dunn in the words was not such that he could universally restrain their use by other dealers. For example, Lord HERSCHELL, who was in the majority, said:

"If it were proposed so to employ them [the words] that no reasonable person could suppose that they had reference to the appellant's preparation, such a use would be perfectly unobjectionable. For example, I cannot conceive any one imagining that a 'fruit salt umbrella' was in any way connected with the article manufactured by Mr. Eno."

If, therefore, the use of the word "Celluloid," in connection with starch, was calculated to deceive the public, and induce it to believe that the complainant's article of manufacture was one of the ingredients of the defendant's starch, and to be led to purchase the article, then the prayer of the bill should be granted. In a clear case of intentional or actual deception, there is not much need of testimony as to the possibility that purchasers would be misled. *Tobacco Co.* v. *Finzer*, 128 U. S. 182, 9 Sup. Ct. Rep. 60. In a doubtful case, testimony is valuable. The question is, to a certain extent, one of fact. While, in my opinion, individual purchasers would wonder whether "Celluloid Starch" contained pyroxyline, by reason of the fact that celluloid has been used for so many different purposes, I cannot find, in the absence of affirmative testimony upon the subject, that any portion of purchasers would suppose or believe that the defendant's starch was connected with celluloid. I do not think that the purchasers of "Ivory Starch" suppose that the starch has any connection with ivory, but consider that the name is a fanciful and attractive one, and symbolizes that the effect of the starch is to give the appearance of ivory. In the same way the word "Celluloid" was used in connection with starch to make an attractive name, and suggest that the starch produced the glossy appearance of celluloid. I therefore find that the distinctive portion of the complainant's corporate name has been used, against its will, by the defendant, and that its trade-mark has been likewise used; but that it does not affirmatively appear that said name and said trade-mark have been used in a way to induce the public to believe or create the impression that the starch which bears the name was connected with the complainant, or was the product, in part, of its manufacture. The prospect that the complainant will in the future want to manufacture starch, or some article which has the use of and simulates starch, is too shadowy to base an injunction upon. Prof. Morton thinks that it is highly probable that a method might be devised by which celluloid could be converted into a starch-like body fit for use as a substitute for starch. This statement of probabilities, of the correctness of which I entertain no doubt, is too indefinite to be the foundation of an injunction. The bill is dismissed.