**RANDLE v. UNITED STATES.**

No. 7410.

United States Court of Appeals for the
District of Columbia.

Decided July 29, 1940.

R. H. McNeill, of Washington, D. C., for appellant.

David A. Pine, U. S. Atty., and Arthur B. Caldwell, Asst. U. S. Atty., both of Washington, D. C., for appellee.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice.

The appellant, hereafter referred to as the defendant, was convicted upon a jury trial in the District Court of the United States for the District of Columbia of the crime of obtaining money by false pretenses, and was sentenced to imprisonment in the Washington Asylum and Jail. The statute under which the defendant was indicted provides for the punishment of one who "by any false pretense, with intent to defraud, obtains from any person anything of value . . . ." D.C.Code (1929) tit. 6 § 85. The appeal raises questions concerning the sufficiency of the indictment, the sufficiency of the evidence to support the verdict, the refusal to declare a mistrial because of alleged misconduct of the prosecuting attorney, the exclusion of evidence, and the correctness of an instruction given. We shall discuss each of these topics separately, stating under each such facts as are necessary to an understanding of the point raised.

## I.

The indictment charged:

"That on, to wit, the nineteenth day of January, 1939, one Catherine H. Reed had a son by the name of Rufus Reed who was a student in the University of Pennsylvania.

\* \* \*

"That on, to wit, the nineteenth day of January, 1938, there was in the District of Columbia aforesaid one Rosalyn Randle, otherwise known as Helen G. Randle, otherwise known as Helen Gertrude Davis, and hereinafter in this indictment designated and called Rosalyn Randle, who had, on previous occasions, to wit, January tenth, eleventh, twelfth and thirteenth, 1938, lectured in the Shoreham Hotel, in said District, and that the said Catherine H. Reed attended said lectures and met and became acquainted with the said Rosalyn Randle; and that at the said lectures and in the hearing and presence of the said Catherine H. Reed, the said Rosalyn Randle stated and represented herself to be an international authority and lecturer on nutrition and psychology and a mental healer; and that thereafter in the District of Columbia aforesaid, and on the nineteenth day of January, 1938, the said Rosalyn Randle unlawfully, knowingly, designedly and with intent to defraud, feloniously did pretend and represent to the said Catherine H. Reed, then and there being, that she, the said Rosalyn Randle, had many years of experience as a healer and had specialized in the treatment of mental cases and was particularly qualified and equipped to diagnose and treat the said son of the said Catherine H. Reed, and that the said Rufus Reed was weak willed and had an unbalanced mind and that he had a suicidal complex, and that she had received letters from the said University of Pennsylvania authorities, including one R. A. Brotemarkle, in which they had advised her that they, the said authorities of the University of Pennsylvania, did not wish the said Rufus Reed to remain in the said University in his diseased condition as his presence there created a dangerous condition for the entire student body, and that the said authorities had been forced by the danger of the situation to appoint a student guard to accompany the said Rufus Reed at all times, and that the said University authorities had sent her, the said Rosalyn Randle, a picture of the brain of the said Rufus Reed, and that said picture showed malformation of said brain, and that the University officials had requested her to take charge of the boy due to his dangerous mental condition, and that the said Rosalyn Randle was well known among the authorities of the University of Pennsylvania and that she had handled many mental cases of this particular type, and that the said Rosalyn Randle had been hired by the well known and wealthy Reynolds family of North Carolina, to accompany the son and heir of the Reynolds tobacco millions to the Island of Crete, to treat the said son for exactly the same type of mental ailments.

"And the Grand Jurors aforesaid, upon their oath aforesaid, do further present:

"That she, the said Rosalyn Randle then and there offered for a fee of five hundred dollars, to cure the said Rufus Reed of this mental ailment by prescribing certain diets and certain mental treatments, and also to slow down the action of the brain and to increase his height by at least two inches.

"And the Grand Jurors aforesaid, upon their oath aforesaid, do further present:

"That by color and means of which false pretenses and representations aforesaid, the said Rosalyn Randle, did, on the said nineteenth day of January, 1938, and at and within the said District of Columbia, with intent to defraud, feloniously, knowingly and designedly obtain from the said Catherne H. Reed, five hundred dollars in money, of the value of five hundred dollars, of the money and property of the said Catherine H. Reed, which said five hundred dollars in money, of the value aforesaid, the said Catherine H. Reed, relying upon the false pretenses and representations aforesaid, which she believed to be true, and being deceived thereby, did then and there give to the said Rosalyn Randle.

"Whereas in truth and in fact, the said Rosalyn Randle was not an international authority and lecturer on nutrition and psychology, nor a mental healer, nor was the said Rufus Reed weak willed, nor had he an unbalanced mind, nor had he a suicidal complex, nor had she, the said Rosalyn Randle, received letters from the said University of Pennsylvania authorities, including one R. A. Brotemarkle, in which they had advised her that they, the said authorities of the University of Pennsylvania, did not wish the said Rufus Reed to remain in the said University, nor had his presence there created a dangerous condition for the entire student body, nor had the said authorities, including the said R. A. Brotemarkle, stated to her in any form or in any manner that his presence in the University created a dangerous condition for the entire student body of said University of Pennsylvania, nor had the said University authorities been forced, or stated that they had been forced, by the danger of the situation to appoint a student guard to accompany the said Rufus Reed at any time, nor had they, the said University authorities, including the said R. A. Brotemarkle, sent her, the said Rosalyn Randle, a picture of the brain of the said Rufus Reed, or a picture of said brain showing any malformation thereof, nor had the university officials, including the said R. A. Brotemarkle, requested her to take charge of the boy due to his mental condition, nor was the said Rosalyn Randle well known among the University of Pennsylvania authorities, nor had she handled many mental cases of this or any other type, nor had the said Rosalyn Randle been hired by the Reynolds family of North Carolina or any other family of North Carolina, to accompany their son to the Island of Crete and treat the said son for any mental ailment, as she, the said Rosalyn Randle, at the time of the making by her of the said false pretenses and representations aforesaid, then and there well knew; against the form of the statute in such case made and provided, and against the peace and government of the said United States."

The defendant demurred to the indictment and the trial court overruled the demurrer.

▇▇▇ The defendant contends that this was error because the real basis of the prosecution is found in that paragraph of the indictment charging:

"That she, the said Rosalyn Randle then and there offered for a fee of five hundred dollars, to cure the said Rufus Reed of this mental ailment by prescribing certain diets and certain mental treatments, and also to slow down the action of the brain and to increase his height by at least two inches." The defendant urges that the indictment thus describes but an undertaking to be performed in the future. She relies upon the familiar proposition that to be the proper subject of an indictment for obtaining money by false pretenses the misrepresentations must relate to present or past facts, as distinguished from something to take place in the future. The proposition stated is correct, but the argument ignores all of the allegations of the indictment except those in the paragraph last above quoted. The indictment must be read as a whole, and so read it plainly describes numerous false representations of present and past facts, and it charges that their falsity was known to the defendant, that they were made with the intention of defrauding Mrs. Reed, and that she believed them and acted upon them by paying money to the defendant. Thus the indictment adequately charged a public offense. That false representations of present or past facts become effective only by being coupled with a false promise does not take a case out of the operation of the statute.

948

Clagett v. United States, 1923, 53 App.D. C. 134, 289 F. 532; State v. Wren, 1933, 333 Mo. 575, 62 S.W.2d 853; Cook v. State, 1936, 170 Tenn. 245, 94 S.W.2d 386; State v. Parkinson, 1935, 181 Wash. 69, 41 P.2d 1095; 22 Am.Jur. 452; Note, 1923, 24 A.L.R. 397, 401; Note, 1922, 17 A.L.R. 199, 201; Note, 1907, 7 L.R.A.,N.S., 278.

In Clagett v. United States the defendant was convicted of obtaining money by false pretenses. The evidence for the Government was that the defendant had falsely represented that he had money in a bank —by delivering to the prosecuting witness a check thereon and thereby obtaining from the prosecuting witness, who cashed the check for him, the face amount thereof. The defendant testified in his own behalf that the transaction was a loan, that he had given the check to the prosecuting witness for security only, with the understanding that it was to be held three days when the defendant would "take it up." The defendant also offered, but was not permitted, to prove that he had ultimately repaid the amount of the check to the prosecuting witness, contending that this was admissible to support his claim that the transaction was a loan and that the check was accepted by the prosecuting witness as security only and that accordingly there was no false pretense in the transaction. On appeal this court sustained the conviction. It held that the defendant's testimony that the transaction was a loan itself constituted no defense and that therefore the offered testimony was properly excluded. The court said:

"The testimony of the defendant . . . sustained his conviction, quite as unmistakably as did that of the prosecuting witness. It should be noted that the transaction as explained by the defendant, was not merely a promise made by him to repay the loan, but also the deposit of the check with the prosecuting witness as inducement and security therefor. It was the latter factor which transgressed the statute. In 19 Cyc. 396 et seq., it is stated under 'False Pretenses':

" 'While the crime is not committed by a mere false promise, without a false statement of fact, a false statement of fact may become effective only by being coupled with a false promise. When this is the case, the statement of fact and the promise may be considered as together constituting the false pretense, and a conviction may follow, or, if the statement of fact and the promise

can be separated, and prosecutor relied in part on the former, the promise may be disregarded, and the defendant be convicted on the statement of fact. * * * Passing off a worthless check or draft, or a check which accused has no reason to suppose will be honored, comes within the above rule, for it is tantamount to a representation that accused has credit with the drawee to the amount of the paper.'

" 'Consequently, according to the defendant's own testimony, the crime was complete when he obtained the money upon his promise secured by the check, and therefore the repayment of the money afterwards could amount to nothing more than mere reparation, and could not serve as a defense to the indictment. . . ." [53 App.D.C. at 137, 138, 289 F. at page 535, 536]

In Cook v. State the defendant falsely represented to one Lanier, the owner of a grocery business, that the defendant's father had recently died and left him $18,000 in government bonds, and the defendant offered to purchase, and Lanier agreed to sell, the business mentioned. The defendant further falsely represented that he had arranged with a named bank to sell the bonds in order to raise the money to buy the business. The defendant then borrowed $100 in currency from Lanier in exchange for a post-dated check on the bank, ostensibly for expense money to go and get his bonds. Later by telephone he asked for $35 more "to arrange some matters with his sister before he could get the bonds," and Lanier wired him this amount. Nothing thereafter was heard from the defendant for several days. He was ultimately arrested, charged with obtaining money under false pretenses, and convicted. It will be noted that in the case stated there were two misrepresentations of fact—that the defendant owned the bonds, and that he had arranged with the bank to sell them —coupled with three promises: one, to buy the business; another, in the form of the post-dated check, to pay back the $100 borrowed; and a third, implied in the telephone conversation, to pay back the $35. It was contended on appeal, as it is contended in the instant case, that the defendant obtained the money by a false promise as to his future conduct rather than by a false representation of an existing fact. The Supreme Court of Tennessee held that the conviction was nevertheless proper. It said:

"It is true that to sustain a conviction the false pretense must be with reference to an existing fact and not a mere promise as to a future undertaking. State v. Higgins, 148 Tenn. 609, 256 S.W. 875; Canter v. State, 7 Lea (75 Tenn.) 349. However, when a false promise is coupled with a false statement of fact, the two are taken together as a fraudulent pretense. Both constitute the inducement. The authorities to this effect are abundant and are collected in a note, 7 L.R.A.,N.S., 278. Instances, a defendant falsely represented that he was a pension agent, coupled with his promise that he would obtain a pension for the defrauded party. Pearce v. State, 115 Ala. 115, 22 So. 502. The defendant falsely represented that he had goods in the possession of a railroad company and needed money to pay the freight thereon, coupled with his promise to repay the money to the defrauded party upon the arrival of the goods. State v. Montgomery, 56 Iowa 195, 9 N.W. 120. The defendant falsely represented to an unmarried woman that he was a single man, coupled with his promise that he would use the money obtained from her in furnishing a house for them to live in and that he would then marry her. Regina v. Jenison, 9 Cox (Cr. Cas.) 158. . . . " [94 S.W.2d at page 388]

The defendant further urges against the sufficiency of the indictment the ruling of the Supreme Court in American School of Magnetic Healing v. McAnnulty, 1902, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90. In that case the School of Magnetic Healing and its treasurer as complainants in an action in equity sought an injunction against a fraud order issued by the Postmaster General. Their bill of complaint charged that the order was issued because they were conducting a business upon the theory that "the mind of the human race is largely responsible for its ills, and is a perceptible factor in the treating, curing, benefiting and remedying thereof. And that the human race does possess the innate power, through proper exercise of the faculty of the brain and mind, to largely control and remedy the ills that humanity is heir to . . . " and this without respect to "what is commonly known as divine healing and Christian science . . . ." The bill also alleged that the complainants carried on their business by sending out through the mails, for a consideration, treatments based upon the theory above stated, and instructions to those who wished to become healers under this theory. The bill alleged that the treatment was "confined to practical scientific treatment emanating from the source aforesaid," that is to say, from the alleged faculty of the mind to control and remedy human ailments. A general demurrer to this bill of complaint was sustained by the United States District Court for the Western District of Missouri, but upon appeal to the Supreme Court this ruling was reversed. The Supreme Court held that, upon the facts stated in the bill and admitted by the demurrer, the complainants were entitled to injunctive relief for the reason that whether or not the human mind is susceptible of controlling and remedying human ailments is a scientific question in respect of which at the time of the case scientific opinion was still so unformed and divided that the answer was wholly conjectural, and therefore the Postmaster General could not conclude that the representations upon which the complainants' business was founded were untrue. The case is obviously distinguishable from the instant case. It is true that among the misrepresentations charged in the instant case is included the possession by the defendant of a capacity to cure Rufus Reed by psychological treatment, as well as by dietary treatment and exercises. But it cannot be said, in the present advanced stage of development of psychiatry, that the possibility of curing psychotic or psychoneurotic conditions by psychological methods is so conjectural that the presence or absence in a particular person of capacity to cure mental disease by psychological treatment cannot be proved. Moreover, as will have appeared from reading the indictment set out above, there were many additional misrepresentations.

## II.

At the close of the evidence the defendant asked the court to instruct the jury "upon all the evidence in the case, to return a verdict of not guilty." This the court refused to do. The refusal was proper. Examination of the record shows that the evidence overwhelmingly established the following: The defendant represented to Mrs. Reed that she was one of seventeen outstanding psychologists in the United States, and an eminent mental healer and dietitian; that Mrs. Reed's son Rufus, a student at the University of Pennsylvania, was afflicted with suicidal insanity and was under guard to protect the other students from him; the defendant represented further that she was well acquainted

at the University and was acting in cooperation with the authorities there, and that the latter had informed her that they planned to ask Rufus to remain at home at the conclusion of the semester because they realized that his presence at the University created a dangerous condition for the student body; the defendant further represented that the officials of the University had sent her a picture of the brain of Rufus, which showed an abnormal condition; the defendant also represented to Mrs. Reed that she had had wide experience in the cure of mental disease such as that of Rufus and was accordingly competent to cure him, and that if authorized to do so and paid $500, she would cure him by psychological and dietary treatment and by exercises. Mrs. Reed had for some time been acquainted and associated with the defendant, and had come to have great confidence in her and believed and relied upon the representations set forth, and as a result of them she paid to the defendant the sum of $500 for the promised treatments. The evidence also overwhelmingly established that the representations were untrue, that they were known by the defendant to be untrue, and that they were made with the intention of defrauding Mrs. Reed. We think no reasonable juryman could have come to any other conclusion under the evidence than that the defendant planned and carried out a fraud whereby, contrary to the statute denouncing such conduct as a crime, she obtained money from Mrs. Reed.

### III.

■ During the trial, while the defendant was on the witness stand under cross-examination by the Assistant District Attorney, the following occurred:

"Witness [the defendant] testified in connection with defense Exhibit No. 5, which was the book entitled 'The Proper Diet for Every Case of Impaired Health' that she did not write the major portion of the book, but only inserted the diets after the chapters written by Dr. Tilden, and that in each diet therein, items such as Ozolax, Cali-Kelp, Sweetena, Lubritone, and other prepared products which she sold from her home in Greenville, South Carolina, under the name there advertised in the book, which appeared as follows: 'Helen Randle Health Products, 411 Perry Avenue, Greenville, South Carolina', which address the witness admitted was her family home.

"At this point in the testimony, defense attorney objected to that as being immaterial, and the following occurred:

" 'Mr. McNeill. Is she indicted for selling that food?

" 'Mr. Caldwell. She is indicted for representing herself to be an international authority. I intend to show that she is nothing but a fraud from beginning to end.

" 'Mr. McNeill. I ask your Honor to cite counsel for the remark counsel made in open court.

" 'The Court. Yes. I think you should give us your testimony without telling us what it is.

" 'Mr. McNeill. He denounced her as a fraud. I should ask your Honor to declare a mistrial.

" 'The Court. I overrule the objection and give you an exception, but the jury will disregard statements made by counsel at the present time as to what he expects to do. You hear the questions and answers; that is the testimony.' "

The defendant contends that she is entitled to a new trial because of the statement "I intend to show that she is nothing but a fraud from beginning to end." The Assistant District Attorney had sufficiently answered the question "Is she indicted for selling that food," when he replied "She is indicted for representing herself to be an international authority." That answer was enough to show the relevancy of the subject matter of the cross-examination. The further statement of the Assistant District Attorney was out of place. But, since the evidence available to and introduced by the Government in the case clearly demonstrated that the appellant, in respect of the representations she made to Mrs. Reed, was a fraud, it would not have been improper for the Assistant District Attorney, in his opening statement to the jury outlining the Government's case, to state that the Government expected to prove that the defendant was, in respect of the representations made by her, including those concerning her standing as a healer, a fraud; and it would not have been improper in the Government's argument to the jury, at the close of the evidence, for the Assistant District Attorney to urge that the evidence introduced had proved that the appellant was, in the respects mentioned, a fraud. We therefore cannot say that such serious and improper prejudice must have been suffered by the defendant

from the mere making of the remark out of order as to require a new trial. But we are constrained to say that there is a regular way to try cases, and that the Government ought to abide it and not inject argument into the midst of the examination of witnesses.

We have examined Frisby v. United States, 35 App.D.C. 513, and Waldron v. Waldron, 156 U.S. 361, 15 S.Ct. 383, 39 L.Ed. 453, relied upon by the defendant in this aspect of the case. Those cases are so different on their facts from the case at bar that neither of them is controlling.

## IV.

■■■■ During the presentation of the defendant's case, her counsel offered to prove by several witnesses that they had been treated by the defendant for a nervous condition and had received benefits from the treatments. The court inquired whether or not defendant's counsel intended to ask these witnesses to detail their ailments; the response was in the affirmative. The Government then objected to the admission of this testimony, and the objection was sustained. Exception was taken by the defendant, who now urges that the ruling was reversible error. The ruling was correct. The successful treatment by the defendant of persons other than Rufus Reed could have been made relevant in respect of the question of the defendant's capacity to cure him only by proof that the ailments of the others were like his ailment. It is within the discretion of a trial judge to exclude evidence which can be made relevant only by the determination, upon further evidence, of collateral issues which may confuse the jury and divert their attention from the essential issues in the case itself on trial. See 1 Wigmore, Evidence (2d ed. 1923) §§ 443–4, and cases cited, and in particular Bemis v. Temple, 1894, 162 Mass. 342, 344, 38 N.E. 970, 26 L.R.A. 254, and Metropolitan Asylum District v. Hill, 1882, 47 L.T.R.,N.S., 29, and see Schaffer v. Lehman, 1875, 2 MacArthur (9 D.C.) 305. In Metropolitan Asylum District v. Hill the noxious quality of a particular hospital was in question and evidence of the effects of other hospitals in spreading contagion was offered but rejected. In approving this ruling Lord O'-Hagan said:

"Without proof as to the state and management of the other hospitals, so as to establish a substantive similarity, any inferences drawn from a comparison of their opera-tion with that of the H. asylum might have been quite fallacious and deceptive. But, even without regard to this . . . it would have involved the jury in a multitude of collateral inquiries, calculated to confuse and embarrass them; and it might have been endlessly prolonged by an indefinite multiplication of objects of comparison. To keep such investigations within reasonable limits, and secure promptitude, precision and satisfaction in the demonstration of justice, it seems to me that Courts should be very jealous of the admission of such proof." [47 L.T.R.,N.S., 31]

We cannot say that it was an abuse of discretion for the trial judge in the instant case to exclude the offered evidence.

## V.

■■■■ Among other instructions given to the jury by the court were the following:

"The jury are instructed that it is not necessary, to constitute the crime of obtaining money by false pretenses, that the false representations, wilfully made by the defendant and in fact relied upon by her victim, should be direct, definite, and positive statements of fact. It is enough if the said false statements and representations are artfully and indirectly drawn, so that they are sufficient to deceive a person of ordinary intelligence, and in fact did deceive in the case at bar. All that is requisite is that the representations shall have been so worded as reasonably to deceive a person of ordinary intelligence; and that they in fact deceived the party to whom they were addressed, and exercised a preponderating influence, inducing her to deliver her money.

"The jury are instructed that even though they may believe that the defendant could not have effected any cure of any disease which was real or imaginary and therefore believing that the offer of the defendant was impossible to execute, yet such a belief does not excuse the guilt of the defendant either, because the law is, and the courts have so held, that 'The objection that on its face the scheme was impossible of execution, and therefore should have deceived no one is without merit. Schemes to defraud depend for success, not on what men can do, but upon what they can be made to believe, and the credulity of mankind remains yet unmeasured.' "

The defendant urges that the second paragraph above set forth was defective in its use of the phrase "schemes to defraud,"

and "misleading in that the belief of the jury, as to the alleged cures, was substituted for that of the complaining witness, and was thus confusing. It is, therefore, impossible to determine the meaning sought to be conveyed in this prayer."

While the word "scheme" does not itself occur in the statute, the language of the statute is broad enough to cover a scheme to defraud. A scheme is a plan or design, and, as has been pointed out above, the evidence plainly shows in this case a planned fraud. There was no error in the use of the phrase "schemes to defraud."

 Was the paragraph complained of fatally confusing: Read alone, its meaning is obscure. But when it is read in connection with the paragraph immediately preceding it, it cannot, we think, be said to be so confusing and in consequence so harmful as to require reversal.

When the two paragraphs are read together, it is apparent, we think, that the first one tells the jury that it is enough that the misrepresentations of the defendant are of such nature as reasonably to deceive a person of ordinary intelligence, provided they actually deceive the one to whom they are addressed, and that the second paragraph states that the foregoing is true even though the jurymen would not themselves have been deceived by the representations. This being the apparent meaning of the two paragraphs, the defendant has no basis for complaint. An instruction in the terms of the first paragraph was held correct by this court in Partridge v. United States, 1913, 39 App.D.C. 571, Ann.Cas.1917D, 622. What was said in the second of the two paragraphs follows as a corollary from the first.[1]

Affirmed.

---

[1] In other jurisdictions, it is held that while the lack of plausibility of pretenses is relevant upon the question whether or not they were relied upon by the person alleged to have been defrauded, if that question is answered in the affirmative it makes no difference, so far as guilt is concerned, whether the pretenses are plausible or otherwise. Statutes of the character of that involved in the instant case, are said to be "designed to protect the unwise and the credulous as well as the able and the vigilant." Palotta v. State, 1924, 184 Wis. 290, 294, 295, 199 N.W. 72, 74. In that case the court said also: "When one has succeeded in defrauding another by means of false representations, he should not be allowed to shield himself by the claim that his victim was less clever or more credulous than himself. Hence it is not the prevailing rule or the rule in this state that, where all the other ingredients of the offense have been committed, the defendant should be acquitted on the ground that the person defrauded failed to exercise ordinary care and prudence. The real question is not whether the representations are such as might deceive persons of ordinary care, but whether they are such as are adapted to deceive and do deceive the persons to whom they are made." And see Slaughter v. Commonwealth, 1927, 222 Ky. 225, 300 S.W. 619, 56 A.L.R. 1209; Commonwealth v. Johnson, 1933, 312 Pa. 140, 148, 167 A. 344, 347, 89 A.L.R. 333; 11 R.C.L. 833.