**S. C. JOHNSON & SON, Inc. v. JOHNSON et al.**

No. 103, Docket 21141.

United States Court of Appeals
Second Circuit.

June 2, 1949.

CLARK, Circuit Judge, dissenting.

William T. Woodson, Chicago, Ill., Rogers & Woodson, Chicago, Ill., Kenefick, Cooke, Mitchell, Bass & Letchworth, Buffalo, N. Y., for plaintiff-appellant.

Bean, Brooks, Buckley & Bean, Buffalo, N. Y., Edwin T. Bean, Conrad Christel, Buffalo, N. Y., for defendant-appellee.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

The plaintiff's motion made on May 20, 1948, from whose denial this appeal has been taken, was a sequel to our decision in 1940[1] and to the steps taken under it. We then declared—as the only relief to which the plaintiff was entitled—that the defendant must add "in immediate juxtaposition" to the words, "Johnson's Cleaner," the suffix, "made by Johnson Products Company, Buffalo, N. Y." We refused to forbid him the use of his name, "Johnson," as the district judge had done, although we agreed that that use had "caused confusion among the plaintiff's customers." The judgment of the District Court was entered on our mandate on April 21, 1941, and the defendant adopted a new label in which the words: "Johnson's Cleaner," printed in blue ink at the top, are immediately followed around the bottom by the legend: "Made by Johnson Products Company, Buffalo, N. Y.," printed in letters of red ink of the same size. The supplemental complaint alleged these facts and added that the original defendant, John W. Johnson, had turned over the business to a firm of five partners consisting of himself and four others, of whom only one was named Johnson. It alleged that this firm was doing business under the old name, "Johnson Products Company";

that the changed label did not conform to the decree; that the defendants' use of the name, "Johnson's," was "likely to and does cause confusion or mistake, and deceive purchasers as to the source of origin of defendants' product"; and that the only "effective protection that can be given to the public against confusion, mistake and deceit" was to prevent altogether the use by the defendants of the word, "Johnson's," as a brand or trade-mark. The plaintiff urges four reasons why it should be allowed to file this supplemental pleading: (1) that the label does not conform to the judgment; (2) that the original injunction did not give the plaintiff adequate relief or protect the public; (3) that the original defendant had taken in the four new partners; and (4) that the Lanham Act[2] has since been passed.

We agree that the judge had jurisdiction at any time to entertain a motion to modify the injunction;[3] and it is not necessary to decide whether it was necessary as a preliminary for him to ask leave of this court because of our decision on the former appeal. The cause is now before us, and it would be a barren formality to reverse the order, grant leave to the judge to entertain that motion, have him enter a new order, and compel the plaintiff to appeal again. We shall therefore at once proceed to the merits. As to the first point, we hold that the new label exactly conforms to the decree. As to the second, we hold that it was irrelevant under the Act of 1905, 33 Stat. 724, that the suffix has not prevented all mistake and confusion. Upon this we have nothing to add to what we said before, when we very deliberately assumed that the public might still be confused after the prescribed change had been made. As to the third point, we hold that it makes no difference that the original defendant has now associated himself with four partners, three of whom do not bear his name. The business has continued under its original name and whatever rights it has gained since its origin in 1932, have inured to the benefit of

---

[1] 2 Cir., 116 F.2d 427.

[2] §§ 1051-1127, Title 15 U.S.C.A.

[3] United States v. Swift and Company, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; Dugas v. American Surety Co., 300 U.S. 414, 57 S.Ct. 515, 81 L.Ed. 720.

the firm. For many years it has been the law that the old good-will passes with the business.[4] The motion was a patent effort to procure a reargument after a lapse of seven years, and has not the slightest justification save for the enactment of the Lanham Act in 1946. To this we address ourselves as the only point deserving discussion.

■ That act did indeed put federal trade-mark law upon a new footing. The Act of 1905 had made the registration of a trade-mark only prima facie evidence of ownership,[5] and the question must be regarded as never finally settled whether it created a substantive federal trade-mark law, as distinct from the common-law of the states, or whether it merely gave jurisdiction to the district courts and certain procedural advantages to the owner.[6] The Lanham Act put an end to any doubts upon that score, and to the confused condition in which those doubts involved the whole subject, especially after Erie Railroad Company v. Tompkins.[7] These were fully discussed by Judge Wyzanski in his opinion in National Fruit Product Co. v. Dwinnell-Wright Co.,[8] but they ceased to be important after Congress provided that any infringer should "be liable to a civil action by the registrant for any or all the remedies hereinafter provided";[9] and that the registration certificate once become "incontestable" after five years,[10] should, with certain exceptions not here relevant, be conclusive evidence of the registrants' exclusive right to use it.[11] This conclusion is confirmed, if confirmation is necessary, by the report of the Senate Committee, of

which we quote a portion in the margin.[12] Nevertheless, although it is no longer open to doubt that the present act created rights uniform throughout the Union, in the interpretation of which we are not limited by local law, it does not follow that, in determining what these are, we are not to be guided by the existing common-law, especially in regard to issues as to which that law was well settled in 1946. In the case at bar the issue is of the meaning of the following language: "any person who shall in commerce (a) use * * * any reproduction * * * of any registered mark," which "use is likely to cause confusion or mistake or deceive purchasers as to the source or origin" of the goods on which the owner has used it, shall be liable to civil action. The parallel section of the Act of 1905[13] beginning at its second sentence was practically the same, except that it subjected to civil action only those who should "affix" the registered mark "to merchandise of substantially the same descriptive properties as those set forth in the registration." Clearly a change, and a most substantial change, was intended, and the question is what that was.

■ The law of trade-marks, which is in any event only a part of the law of unfair competition,[14] was originally designed to protect the mark's owner from the diversion of customers who would otherwise have bought of him. By 1905, however, this had been extended by making the mark in some situations cover goods on which the owner had never used it. So far as we have been able to find, the following are the only decisions in which federal

4 Kidd v. Johnson, 100 U.S. 617, 25 L.Ed. 769.

5 § 16, 33 St. at L. 728.

6 Pecheur Lozenge Co. v. National Candy Corp., Inc., 314 U.S. 603, 62 S. Ct. 182, 86 L.Ed. 485; 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103.

7 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

8 D.C., 47 F.Supp. 499.

9 § 1114, Title 15 U.S.C.A.

10 § 1065, Title 15 U.S.C.A.

11 § 1115(b), Title 15 U.S.C.A.

12 "It would seem as if national legislation along national lines securing to the owners of trade-marks in interstate com-

merce definite rights should be enacted and should be enacted now.

"There can be no doubt under the recent decisions of the Supreme Court of the constitutionality of a national act giving substantive as distinguished from merely procedural rights in trade-marks in commerce * * * and * * * a sound public policy requires that trade-marks should receive nationally the greatest protection that can be given them." (U.S.Code Congressional Service, 79th Congress, Second Session, 1946, p. 1277.)

13 § 16, 33 St.L. at L. 728.

14 Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713.

courts had done so. In Carroll v. Ertheiler,[15] Judge Butler allowed the manufacturer of smoking tobacco to enjoin the use of his mark on cigarettes, which he had never made. In Collins Co. v. Oliver Ames & Sons Corp.,[16] Justice Blatchford extended the protection of a mark used on metal picks and hoes and other digging instruments, to metal shovels, which the owner had never made. In Celluloid Manufacturing Co. v. Read,[17] Judge Shipman, on the other hand, dismissed the plaintiff's bill, seeking to enjoin the defendant's use of the word, "Celluloid," upon laundry starch, because starch was remote from anything which the plaintiff sold. In Godillot v. American Grocery Co.,[18] Judge Acheson held a mark used upon general groceries to include coffee and cigars, which the plaintiff had never sold. It will be observed that in all these cases the sales held to infringe were of goods which were "substantially of the same descriptive properties as those set forth in the registration"; and that on the occasion when that was not true, the owner of the mark failed. It seems safe to infer that, when the Act of 1905 used the language we have quoted it intended any rights which it conferred to be coextensive with those which the law of unfair competition recognized, so far as it had developed up to that time.

By 1917 the English courts in a number of decisions, not necessary to consider, had meanwhile extended the cover of a mark or of a make-up considerably further than any of the cases we have cited, or than our own intervening decisions, such as Florence Manufacturing Co. v. Dowd,[19] and British-American Tobacco Company v. British-American Cigar Stores Co.,[20] and they have developed a rationale of the interests to be protected which was more definite than anything in our own books. In Aunt Jemima Mills Co. v. Rigney & Co.,[21] we adopted this reasoning in a case where the infringing goods were syrup and the mark was for pancake flour; that has become the leading case in this country for the now well-established extension of the law of unfair competition in such situations.[22]

Thereafter the question several times arose whether this doctrine was within the terms of the Act of 1905; that is, whether "substantially of the same descriptive properties" referred to the physical character of the goods to which the protection of the mark alone extended, or whether it also covered any of which the owner of the mark might be supposed to be the source. We twice at least strongly intimated that it meant the second, although we recognized that this did some violence to the literal meaning of the words;[23] but the weight of authority was the other way,[24] and in 1946 it was at best most uncertain whether the Act of 1905 went beyond the law of unfair competition in 1905. It is quite enough to explain the change of diction in the Lanham Act that Congress wished to do no more than clear up this doubt—if indeed it was not more than a doubt—and make the protection of the new right coextensive with the law of unfair competition as it was in 1946, just as the Act of 1905 had made it coextensive with the law of 1905. Besides, not only is this a sufficient reason for the change, but there is the strongest possible reason for not reading the language literally, because to do so would frequently result in great hardship to others, and give to the first user of a mark a wholly unjustified power to preempt new markets.

The "Aunt Jemima Doctrine," as we may for brevity call it, needs to be indeed carefully circumscribed. It recognizes two, but only two, interests on which the

---

[15] C.C. 1880, 1 F. 688.

[16] C.C. 1892, 18 F. 561.

[17] C.C. 1891, 47 F. 712.

[18] C.C. 1895, 71 F. 873.

[19] 2 Cir., 178 F. 73.

[20] 2 Cir., 211 F. 933, Ann.Cas.1915B, 363.

[21] 2 Cir., 247 F. 407, L.R.A.1918C, 1039.

[22] Restatement of Torts, §§ 730, 731.

[23] Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272.

[24] Atlas Mfg. Co. v. Street & Smith, 8 Cir., 204 F. 398, 47 L.R.A.,N.S., 1002; Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962; Beech-nut Packing Co. v. P. Lorillard Co., 3 Cir., 7 F.2d 967, 969; Walgreen Drug Stores v. Obear-Nester Glass Co., 8 Cir., 113 F.2d 956; Bulova Watch Co. v. Stolzberg, D.C., 69 F.Supp. 543; Triangle Publications, Inc. v. Rohrlich, D.C., 73 F.Supp. 74.

owner can stand: (1) the possibility that the trade practices of the second user may stain the owner's reputation in the minds of his customers; and (2) the possibility that at some time in the future he may wish to extend his business into that market which the second user has begun to exploit. These are legitimate interests and they are properly weighed against the second user's interests; but it is far from true that the mere fact of confusion between the two users should always and of itself tip the scales in favor of the first. In Emerson Electric Manufacturing Co. v. Emerson Radio & Phonograph Corporation [25] and Dwinell-Wright Company v. White House Milk Company, Inc., [26] we tried to show how the power of a first user to establish such a premonitory lien upon a future market might lead to great injustice.[27] In deciding such "interstitial" issues, which legislatures at times wisely leave to them, courts are obliged to take over their function pro hac vice and to decide which of the conflicting interests they think should prevail. The case at bar is an admirable example of how unfairly a literal enforcement of the language of the new act may operate. The plaintiff does not sell cleaning fluid; it makes waxes and other polishes, and the defendants cannot possibly turn away from it any customers who would buy these instead of cleaning fluids. When John W. Johnson began business in 1932 he did so under his own name—the customary and innocent identification of his goods with himself. After three years the plaintiff tried to stop his use, and it was unsuccessful in 1941; not, as we then said, because no confusion had developed, for some had, and was probably to some degree inevitable; but because we held that the resulting prejudice to the plaintiff did not counterbalance Johnson's interest in doing business under his own name. After a lapse of five years—in 1946—the Lanham Act was passed, and, if the plaintiff is right, it has destroyed the assurance, which our decision gave to Johnson and his present associates, that the good-will they built up in the name of "Johnson" they would be allowed to enjoy. True, nobody likes to have his reputation subject to the hazards of another's conduct; but there is no suggestion that in fact the defendants have tarnished the plaintiff's name in the minds of those who may think they are buying its goods. Again, although the plaintiff may at some future time wish to make cleaning fluids, it does not now even intimate such a purpose. We cannot conceive any justification in these circumstances for·allowing it to reach a choking hand into a market not its own, and to deprive the defendants of an interest, natural and proper in its origin, and after sixteen years presumably an important element in their business. If Congress really meant to allow every first user of a mark so to stifle all excursions into adjacent markets upon showing no more than that confusion would result, it seems to us that it would have said so more clearly. In the case of fabricated marks which have no significance, save as they denote a single source or origin of the goods to which they are attached, the first user's right may indeed go so far. The second user can then show no interest of his own; and if, as will then appear, his only purpose is to trade on the first user's good-will, it is indeed time to intervene. That situation is polar to this, and we do not believe that both have been swept into a common condemnation by the language used to create the new federal right.

Order affirmed.

CLARK, Circuit Judge (dissenting).

In its affirmance of the summary dismissal of the plaintiff's application the court has taken a long step in the interpretation and limitation of the new Lanham Trade Mark Act; in effect it has cut this Act so extensively heralded by sponsoring groups down to a size consistent with the court's conceptions of public policy. While I regard these conceptions highly, I am troubled by the fact that the Act is rather clearly the expression of contrary views vigorously held by persons and groups who were able to exercise a persuasive influence

---

[25] 2 Cir., 105 F.2d 908, 910.
[26] 2 Cir., 132 F.2d 822.
[27] See also Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347; Durable Toy & Novelty Corp. v. J. Chein Co., 2 Cir., 133 F.2d 853.

in the halls of Congress during its long period of germination. That other interests, those of consumers, for example, may have been more imperfectly represented there does not seem to me to lessen our problem, for we must take the legislative process as we find it, not as we wish it might be. The question seems to me therefore a vastly important one as to the relations of court and legislature; and I am indeed sorry that it is left with only a statement of the court's policy views as full justification for the narrowing interpretation. For some time I have been urging my colleagues to a consideration of the impact of the new legislation;[1] but I must confess now to a feeling of frustration that discussion, when had, is thus limited.

It may be that when a court feels a responsibility to curtail the possible scope of undesirable legislation, the best thing it can do is to rest its case straightforwardly on policy grounds without getting involved in the views expressed by the legislative proponents. Even if we concede as much, I still think it extremely desirable to await the full telling of the story, rather than to bar the way summarily at the beginning.[2] As it stands, it must be assumed that the new legislation affords no relief, though all the allegations of the plaintiff be accepted in full.[3] This is a pretty extensive position and may well be unnecessary; a hearing of the facts might show that the plaintiff had a somewhat exaggerated view of its own grievances. And if they are true as stated, it still is not clear but that some additional remedies, perhaps not as much as are asked for, might be devised which would make a better adjustment of the troublesome situation between these parties.[4] Whatever may be the law, we cannot be very happy at a decree which, on the plaintiff's allegations, has proven completely stultifying in that it takes away with one breath what it appears to grant by way of relief on another. Summary disposition of the case is a repudiation of any attempt to find a real workable remedy for an adjudicated wrong.[5]

Since I am in very real doubt as to how strict should be the interpretation of the new Act, I shall not try here to advance a definitive interpretation in contrast with that stated in the opinion, but only to suggest the questions which arise in my mind. As is pointed out, the Lanham Act certainly made extensive and far-reaching changes

---

[1] As in Best & Co. v. Miller, 2 Cir., 167 F.2d 374, 378, and see also California Apparel Creators v. Wieder of California, 2 Cir., 162 F.2d 893, 900, 901, 174 A.L.R. 481, certiorari denied 332 U.S. 816, 68 S. Ct. 156, 92 L.Ed. 393, and LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, 118, 119, certiorari denied Lorraine Coffee Co. v. LaTouraine, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663.

[2] See L. Hand, J., dissenting in California Apparel Creators v. Wieder of California, supra. The fact that I think this is an inappropriate case for a summary judgment does not, however, signify disapproval of the salutary principle of the rule itself, F. R. 56—as distinguished from some of the restrictive judicial glosses put upon it. See my article in 15 Brooklyn L.Rev. 1, 9, also 48 Col.L. Rev. 780; 45 Col.L.Rev. 964; 61 Harv. L.Rev. 375; 55 Yale L.J. 810; 34 A.B. A.J. 187.

[3] Thus plaintiff desired to introduce evidence of an extensive survey showing the widespread acceptance by housewives of plaintiff as the producer of defendants' product, notwithstanding the operation of the injunction previously entered herein.

[4] The defendants' label, which is here fully approved, does appear to be quite similar to the plaintiff's; it would not seem out of the way now to order changes which would tend to compel dissimilarity. Among points which might be considered are the similar yellow background (not directly touched upon in the injunction), the emphasis here permitted the defendants to emphasize a company, "Johnson Products Company," as is the plaintiff, rather than a collection of individuals, as are the defendants, and the substantial nonreadability of the location, "Buffalo, N. Y.," by reason of its position in the oval lettering on the right side reading from the bottom up on the label.

[5] Thus, in accepting the finding below of confusion among the plaintiff's customers caused by the defendant's use of the name we said: "We should have so found ourselves; and indeed the testimony leaves no doubt that, while he did not actively instigate his employees to mislead customers, the defendant instructed them not to undeceive any who were already misled and to take advantage of their confusion." 116 F.2d 427, 429.

in the law of trademarks as a whole, some of which are cited. In this particular connection it substituted for the definitely restrictive language of the older Act limiting infringing sales to those of goods which were "substantially of the same descriptive properties as those set forth in such registration" a broad recovery for a use "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services." 15 U.S.C.A. § 1114(1). These broadening provisions, twice stated in this subsection, seem quite consistently carried out through the Act.[6] Having in mind the well-known intent of the sponsors to broaden trademark protection, they would seem to point strongly to a definite plan to grant recovery wherever a mark is "intended to be used to cause confusion or mistake or to deceive purchasers," to quote the concluding words of the subsection. In fact, it appears to be substantially conceded that the literal reading is that way; but it is held that this reading must be rejected for two reasons. The first, which is little stressed, is not overclear to me; it seems to be that just as the 1905 Act was designed to bring the law

up to that date, so this 1946 Act is designed to bring the law up to the 1946 date. But unfortunately there does not appear to be a quite clear law of 1946, as I fear those who have struggled with our decisions such as Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969, compared with Best & Co. v. Miller, 2 Cir., 167 F.2d 374, certiorari denied 335 U.S. 818, 69 S.Ct. 39, will understand. Moreover, this assumes what is set out to be proven and what is contrary to the professed desire of the protagonists, namely, that the Act was intended only as declaratory of existing law. The argument which is really stressed, however—"the strongest possible reason for not reading the language literally"—is the argument of policy already forecast in certain previously existing authorities.[7]

Even though the policy stated, the hardship to others and the unjustified power given the first user of a mark to pre-empt new markets, is compelling, yet there are countervailing arguments which have appealed to many. This is not a monopoly of a natural product or of an invention, but of a name or mark built up by judicious advertising. The question is insistently

---

[6] Thus, see, inter alia, the provisions as to registrable trademarks, 15 U.S.C.A. § 1052(d) (denying registration to a mark so resembling a registered mark "as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive purchasers"—a provision which needs to be read in its entirety for its full impact); § 1064(c) (cancellation of registration); § 1066 (interference); § 1115(b) (the defense of invalidity of the mark); the intent of the Act stated in § 1127; and the broad action for false description or representation of goods generally given in § 1125(a), referred to in California Apparel Creators v. Wieder of California, supra, 2 Cir., 162 F.2d 893, at pages 900, 901, footnote 12.

[7] It should be noted, however, that there is strong authority for what is called the "federal" rule or is "popularly known as the Hand Doctrine" from its original impulse in the Second Circuit, cf. Lunsford, op. cit. infra, 35 Va.L.Rev. 214, 217, that relief will be granted as between noncompeting goods if there is confusion as to the source. Thus see, e.g., Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, the analysis by Judge Yankwich in Sunbeam Corp. v. Sunbeam

Lighting Co., D.C.S.D.Cal., 83 F.Supp. 429, of Ninth Circuit cases, including Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348, the effect given by Judge Wyzanski to the new Massachusetts statute, Stat. 1947, c. 307, in Food Fair Stores v. Food Fair, D.C.Mass., 83 F. Supp. 445, and the extensive collection of cases in the annotation to Lady Esther, Ltd. v. Lady Esther Corset Shoppe, 317 Ill.App. 451, 46 N.E.2d 165, 148 A.L.R. 6, at pages 12, 36–39, 48, 53–92. And this appears to be the view of a great many commentators; thus, in addition to the articles hereinafter cited, see the authoritative statement in 3 Restatement, Torts, §§ 730, 731, 1938. Some commentators speak specifically of the Act as a codification of this rule of law. 2 Wyo.L.Rev. 66; 26 N.C.L.Rev. 424. For the view that the recent trend of cases (prior to the Act) has been to restrict the doctrine, see Zlinkoff, Monopoly Versus Competition: Significant Trends in Patent, Anti-Trust, Trade-Mark, and Unfair Competition Suits, 53 Yale L.J. 514, 538–541, and Brown, op. cit. infra, 57 Yale L.J. 1165, at 1193. So which view, if either, does the new Act codify?

asked why in that case it is necessary to permit another to reap the rewards of the diligence and money expended by the original exploiter. Here, for example, it is urged, and any devotee of the radio knows, that one of the most famous and presumably one of the most expensive of the popular evening radio hours has for years advertised the plaintiff's products. Yoder, The McGees of Wistful Vista, 222 Sat. Eve. Post No. 41, pp. 26, 86, 87, Apr. 9, 1949. One can have little doubt that, as the plaintiff offers to prove, the original defendant, who has already associated with himself four others, one a Johnson, the three others non-Johnsons, is reaping the benefit of the plaintiff's advertising of its own products. The literature heralding and explaining the new Act—coming, it must be conceded, mainly from those favoring the legislation—is already vast and has gone over into nonlegal publications.[8] Criticism of restrictive interpretation of the statute has also begun. Thus the well-known case of California Fruit Growers Exchange v. Sunkist Baking Co., 7 Cir., 166 F.2d 971, requiring a showing of competitive practices, has been the subject of extensive criticism.[9] Lunsford, Trade Mark Infringement and Confusion of Source: Need for Supreme Court Action, 35 Va.L.Rev. 214; Callmann, 38 Trade Mark Rep. 304, 308; Note, 48 Col.L.Rev. 648; and see also Callmann, False Advertising As a Competitive Tort, 48 Col.L.Rev. 876; 17 Geo.Wash.L.Rev. 112; 29 B.U.L. Rev. 137; 26 N.C.L.Rev. 424; and 22 Temp.L.Q. 301 as to other decisions. Of course in this field we touch at once issues of the most highly controversial nature. Thus a different philosophy (though without discussion of the effect of the new Act) is ably presented in Brown, Advertising and the Public Interest: Legal Protection of Trade Symbols, 57 Yale L.J. 1165; and see also Zlinkoff, supra note 7. I cite these authorities not to express agreement now with any of them, but rather to lend point to my belief that sooner or later we shall have to accord a more full-dressed hearing to proponents of this legislation than we have yet been willing to do.

I must also express a word of concern about a point of practice, suggested somewhat indirectly in the opinion, that there may be some need of permission from this court for the filing of the new application by the plaintiff. Under the clear-cut provisions of the Federal Rules there seems to me such a complete absence of place for any such restriction that I regret the judicial doubt thus imported into an otherwise clear situation. Perhaps question has arisen because permission was sought below under Federal Rules of Civil Procedure, rule 15(d), 28 U.S.C.A., and this seemed like seeking to amend a pleading in a case in the appellate court; though even here the functions of the appellate court seem properly limited to the judicial review of the judgment itself. See Markert v. Swift & Co., 2 Cir., 173 F.2d 517. But since the

---

[8] I have cited some of these references in the cases in note 1 supra. See also the discussion in the February, 1949, issue of Fortune, vol. 39, p. 147. Thus Miss Daphne Robert, author of The New Trade-Mark Manual, stresses the change in wording from the former Act which is here so important and goes on to say flatly of the new Act: "The goods or services need not be identical or even remotely related. If it is shown that purchasers are likely to be misled by the mark into thinking that the same concern is selling, offering for sale or advertising the goods or services of both parties, relief will be granted." Commentary on The Lanham Trade-Mark Act, 15 U.S.C.A. page 265, at page 286, compare Brown, Book Review, 58 Yale L.J. 511, 512. This is the view she takes in her Manual, pp. 162, 163, and is of course not unusual among trademark lawyers, e.g., Callmann, The "Sunkist" Decision: Trade Marks at the Crossroads, 38 Trade Mark Rep. 304, 308; also references in note 7 supra and in the text infra.

[9] But the court there said "the words 'the same general class of merchandise' and 'goods of substantially the same descriptive properties' are facts essential to infringement under the 1905 Act, and not under the Lanham Act." Its actual decision is thus explained: "In any view of this case, the record is wholly devoid of any finding, or substantial evidence to support a finding, of a likelihood of confusion as to the source of origin, as required to constitute infringement under the Lanham Act." 166 F.2d 971, 973, 975. Hence it is not in point as to the present case in view of the clear finding supra note 5.

case is in judgment, the obvious and necessary course is under F.R. 60(b), which in its presently amended form gives a complete scheme for relief. Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384. Not only does this not call for appellate permission when a case has been affirmed on appeal, but it is obvious that such permission is an unnecessary and undesirable clog on the proceedings. An appellate court cannot act understandingly under F.R. 60(b) without the necessary record which the proceedings in the trial court must supply.[10] To expect it to grant or withhold permission in advance is a futility and an obstruction. The rules themselves quite carefully show when, if ever, appellate permission is to be sought. See F.R. 60(a) as amended, and compare also amended F.R. 73(a) and 75(h).

I would reverse and remand for a hearing of the parties' evidence.

---

[10] Note also the precise provisions of F.R. 60(b) that a motion thereunder "does not affect the finality of a judgment or suspend its operation," thus rounding out the special and separate character of the proceeding, as therein fully described.