GENERAL CONTROLS CO.

v.

HI-G, INC.

Civ. No. 7987.

United States District Court
D. Connecticut.

Dec. 29, 1962.

R. Douglas Lyon, Los Angeles, Cal., Roger McCormick, Hartford, Conn., for plaintiff.

John M. Prutzman, Donald Hayes, Hartford, Conn., for defendant.

BLUMENFELD, District Judge.

This is an action for trademark infringement and unfair competition because of such infringement seeking an injunction against use by the defendant HI-G, Inc. of its corporate name in association with the sale of electric relays or associated products and in connection with advertising or sale of such products. Plaintiff General Controls Co. is a California corporation with its principal office in Glendale, California. Defendant has its principal place of business in Connecticut, under whose laws it is incorporated. Since the plaintiff's trademark is registered under the Trademark Laws of the United States, jurisdiction is founded upon both 28 U.S.C. § 1332 and § 1338(b). Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F. 2d 755, 757 (2 Cir., 1960).

Over the past 32 years, General Controls Co. has manufactured and sold a wide variety of automatic controls and regulating systems. Its first product was a combustion control for boilers. Later, it added gas valves and room thermostats to its line. In 1942, the plaintiff adopted the trademark "hi-g" for valves and control systems which it sells for use on mobile ground equipment and aircraft.

On October 10, 1950, the plaintiff obtained the grant of U. S. Registration No. 531,662 in Class 21 for the term "hi-g" for:

"Valves operated by electric power for controlling the flow of any fluid and adapted to control fluid, fuel, lubricating media, or liquid used in hydraulic control systems." (Caps omitted)

On December 25, 1951, it obtained a further U. S. Registration No. 552,415 in Class 26 on the term "hi-g" for:

"Temperature control and regulating systems for liquid cooled or air cooled internal combustion engines —namely, thermostatically operated valves controlling the flow of cooling liquid or cooling air." (Caps omitted)

On these same respective dates, the plaintiff also obtained the grant of U. S. Registration Nos. 531,663 and 522,415 reciting the same identical goods, but showing the form of trademark as actually used by the plaintiff on such goods, which trademark comprises a wing and shield device as the dominant feature of the mark. On the specimen of the trademark attached to the registration, the letters "hi-g" stand on the crest of a red shield design in the center of a yellow winged configuration, similar to that used by the United States Air Force as its insignia. "GENERAL" is superimposed on the left wing, and "CONTROLS" is superimposed on the right wing. On the shield itself, "G", at the upper left, and "C" at the lower right, are balanced by a pointer at the upper right and a wheel at the lower left, connected by a diagonal lightening mark. The name plates attached to the prod-

ucts intended for mobile installations always display the composite mark.

The plaintiff's trademark was subsequently republished in both Classes under the Lanham Act, 15 U.S.C. § 1062 (c). No question is raised concerning the plaintiff's compliance with statutory steps relating to registration.

■■ There is little force in the mechanical argument that merely because "hi-g" was accepted for registration, the plaintiff may preclude all others from making any use of that mark in commerce. John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314, p. 316 (7 Cir., 1961); S. C. Johnson & Son v. Johnson, 175 F.2d 176 (2 Cir., 1949) cert. denied 338 U.S. 860, 70 S.Ct. 103 (1949). The courts themselves have acknowledged that descriptive words which they have refused to protect have been accepted for registration as trademarks. E.g. Lanolin Plus Cosmetics, Inc. v. Marzall, 90 U.S.App.D.C. 349, 196 F.2d 591, 592 (1952) cert. denied 344 U.S. 823, 73 S. Ct. 22, 97 L.Ed. 640 (1952); See Q-Tips, Inc. v. Johnson & Johnson, 206 F.2d 144, 148 (3 Cir., 1953) cert. denied 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953).[1] When the interests of parties in the right to use a mark do not clash head-on[2] because the products on which the mark is used are not the same, that the use of the mark by a defendant on its products and labels and in its advertising may be "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods", 15 U.S.C. § 1114 (1) (a) is not in itself decisive. Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 612, 613 through fn. 7 (2 Cir., 1960) cert. denied 364 U.S. 909, 81 S.Ct. 271, 5

L.Ed.2d 224 (1960). It is only one of several value-tinged criteria which Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196, 198 (2 Cir., 1962) requires the court to employ in "balancing the *conflicting interests* both parties have in the unimpaired continuation of their trademark use." Avon Shoe Co. v. David Crystal, Inc. (supra), 279 F.2d at p. 613. The criteria to be resorted to in applying this balancing operation are stated in Polaroid Corporation v. Polarad Electronics Corp., 287 F.2d 492 at p. 495 (2 Cir., 1961) cert. denied 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961):

> "Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account. American Law Institute, Restatement of Torts, §§ 729, 730, 731."[3]

### The Difference in the Products

■ The plaintiff has not manufactured or sold any electrical relays particularly adapted for use on aircraft bearing the trademark "hi-g" for the past 20 years. The defendant manufactures and sells hermetically sealed mini-

---

1. Since the defendant makes no claim for cancellation of plaintiff's mark in the nature of declaratory relief or otherwise and inasmuch as the products of the parties are not in competition with each other, the question of the validity of plaintiff's registration is not reached.

2. See Aluminum Fab. Co. of Pittsburg v. Season-All Window Corp., 259 F.2d 314 (2 Cir., 1958); LaTouraine Coffee Co. v. Lorraine Coffee Co. (supra).

3. Expressing an awareness of the difficulty of reconciling "all of the decisions of this court dealing with this problem," Judge Hincks in the Triumph case (supra) 308 F.2d p. 198, declared, "we think the full Bench of the court would now accept the propositions set forth in the opinion in Polaroid Corporation v. Polarad Electronics Corp., 2 Cir., 287 F.2d 492 at 495 (1961)."

ature and electronic time relays, voltage censors and phase censors. There is no product of the defendants which is specifically in competition or is used interchangeably with any manufactured or sold by the plaintiff. The claim for damages and an accounting of profits was waived by the plaintiff at the outset of the trial. While this does not necessarily constitute an admission, it confirms the absence of any basis for finding that anyone ever purchased goods upon which the defendant used its corporate name HI-G, Inc. believing that they were made by the plaintiff. The products are different.

### The Strength of the Mark

A trademark which reflects a certain originality with respect to the goods it identifies, e. g. a fanciful word without independent meaning such as "Kodak", or a common word that is arbitrary as applied, as in the case of "Camel" cigarettes, is regarded as a strong mark because it serves the function of distinguishing goods and of indicating that they come from a common source. Telechron, Inc. v. Telicon Corp., 198 F.2d 903 (3 Cir., 1952); see Columbia Mill Co. v. Alcorn, 150 U.S. 460, 463, 14 S.Ct. 151, 37 L.Ed. 1144 (1893); Stork Restaurant v. Sahati, 166 F.2d 348, 355 (9 Cir., 1948).

To the extent that a mark becomes more descriptive of a product, it becomes progressively weaker in identifying the manufacturer of that product, for a word that describes a product does not as readily identify its manufacturer or seller as a word not normally associated with it. John Morrell & Co. v. Reliable Packing Co. (supra); Durable Toy & Novelty Corp. v. J. Chien & Co., 133 F.2d 853, 855 (2 Cir., 1943) cert. denied 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849 (1943); France Milling Co. v. Washburn-Crosby Co., 7 F.2d 304 (2 Cir., 1925) cert. denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925); see Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495 (2 Cir., 1962).

Why words, merely descriptive of the goods sold, receive no protection was cogently stated by Judge Learned Hand in Oakland Chemical Co. v. Bookman, 22 F.2d 930 (2 Cir., 1927), at p. 931:

> "As to validity, the question is whether the mark was 'descriptive,' or only 'suggestive,' of the goods sold. A 'descriptive' mark is bad for two reasons: First, because it does not in fact advise the public that the goods come from a 'single source' (Coca-Cola v. Koke Co., 254 U.S. 143, 146, 41 S.Ct. 113, 65 L.Ed. 189); second, because, if it did, since the word describes the goods, the protection of the mark would trench upon common speech which should do the same." (Citations omitted)

Judge Hand's rationale extends to a concept of "goods" which embraces *"their quality, properties, functions or uses,"* 3 Rest.Torts § 721 (emphasis added) all of which relate to the needs and desires of the consumer as distinguished from their source of origin. Proxite Products, Inc. v. Bonnie Brite Products Corp., 206 F.Supp. 511 (S.D.N.Y.1962); In re W. A. Shaeffer Pen Co., 158 F.2d 390 (C.C.P.A.1946).

The exposure to the forces of shock and acceleration of gravity upon operational products used in the complex machines in the rapidly enlarging aerospace industry, and the necessity that such products should function accurately when subjected to more than normal gravitational force, has brought an awareness which has extended far beyond those who are engaged in the technical developments in that industry that "g" is used to express acceleration of gravity. The parties agree that the letter "g" is a well-known abbreviation or symbol for the forces of gravity and acceleration. "Hi-g" is commonly used to express a high multiple of gravitational force which may range from a fraction of a "g" up into the hundreds. The abbreviation of "high" to "hi" when hyphenated to "g" is a combination so wide-

ly associated with high gravity as to be generally accepted as a contraction. See e. g. Modern Optics v. Univis Lens Co., 234 F.2d 504, 43 C.C.P.A. 970 (1956).

The defendant corporation was organized for the purpose of manufacturing the miniature relay which its organizers had already developed for use on basically military equipment which had to withstand high shock and high acceleration. It was because these relays had the capability of functioning accurately while being subjected to the shock of extreme acceleration or vibration that they decided to name the company HI-G, Inc.

In 1942, when the plaintiff adopted its mark "hi-g", as shown in its registrations, most controls of the kind it made were used only in stationary positions. The president of the plaintiff company, who was responsible for the adoption of the "hi-g" trademark explained how he came to the conclusion to adopt this particular trademark. As the originator in 1938 of a line of process control valves and comfort controls for use on mobile equipment, the plaintiff was confronted with the "problem of how to describe this line which frankly, wasn't even acceptable or understood even by our customers." "Nobody had the concept of putting valves or relays, or anything else on moving stuff, it just wasn't accepted." Even at that time, it was clear that the plaintiff understood "hi-g" to mean a high multiple of gravitational force. In an advertisement of its valves which it had published in the trade magazines Aviation, Aero Digest and Automotive & Aviation Industries in September of that year, display of the "hi-g" trademark was followed immediately by this explanation:

> "HIGHEST 'g' FACTORS—LOWEST WEIGHT
>
> "Most important operating characteristic of all General Controls Aircraft Type Electric Valves is their positive ability to operate in any position, regardless of vibration, change of motion or acceleration,

i. e., substantial increases in 'g'. This is accomplished without any concession to weight; for although acceleration factors as high as 300g are obtained, valve weight may only be a fraction of a pound."

In its advertisements in those magazines during August of 1942, an asterisk beside "hi-g*" was used as a reference mark to the explanation: "*Trademark —hi-g—indicates high resistance to change of motion, vibration and acceleration as indicated by 'g' factors." What the defendant's customers were being asked to understand about its product when it first adopted "hi-g" as a mark became unmistakable from the trial testimony of the plaintiff's vice-president in charge of sales explaining that the "hi-g" in those advertisements referred to "the ability of the control to operate against very high acceleration factors, g-factors."

When asked by the Court:

> "What would you call it, a description of what quality in the product, or is it a description of a quality?"

he answered:

> "It is a description of a quality in the product, but our trademark actually covers the broad product line, hi-g, because if you will notice, we say hi-g valves, and then highest G-factors. That is where we get this hi-g controls for mobile equipment."

When asked by the Court:

> "I understand, but it was the transition from hi-g into the G-factor as indicating that the G-factor is a quality?"

he answered:

> "That's right, quality of the product, yes, sir."

The evidence offered by each of the parties to explain why they used "hi-g" in connection with their respective products spells out their concurrence of opinion that "hi-g" when applied to their products is used and is intended to be

used to describe a quality in goods they make. I, too, concur.[4]

### Confusion

■■■■ Evidence of actual confusion was exceedingly skimpy. Organized in 1953, the defendant has enjoyed a steady increase in business. Its annual sales curve charted on the basis of a fiscal year ending March 31st has been sharply upward:

22,000 in 1954
40,000 in 1955
119,200 in 1956
314,000 in 1957
467,000 in 1958
990,000 in 1959
1,318,000 in 1960
2,900,000 in 1961

and by September 30, 1962, the end of the first six months of the current fiscal year, sales exceeded $3,000,000. This is enough background against which to gauge the evidence of actual confusion. Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc. (supra), 281 F.2d p. 765, opinion of Judge Clark dissenting. Seven of the eight exhibits the plaintiff introduced to show actual confusion were orders or requests for price quotations on relays which the customers identified by number with the letter prefix "HG". "HG" is not "HI-G". Gordos Corporation and C. P. Clare & Co., who are at least two direct competitors of the defendant, identify the relays they sell by prefix letters "HG" followed by a number. Since the plaintiff does not use that letter prefix to identify any of its parts, those inquiries are not traceable to anything the defendant did in marking its products. One instance suggestive of confusion appeared on a mimeographed sheet, listing electrical parts contained in a rather substantial electronic device named Visicorder manufactured and sold by Minneapolis Honeywell Co., where the plaintiff was identified as the source of supply for a relay made by the defendant. Whatever confusion there may once have been at Minneapolis Honeywell Co., its error seems to have been rectified in the complete Operation & Maintenance Manual which it furnishes to each of its Visicorder purchasers.[5] In view of the volume of business done by the defendant and without knowing more about Gordos Corporation and C. P. Clare & Co. than that they are major direct competitors of the defendant, the evidence introduced to show actual consumer confusion between the products of the defendant and those of the plaintiff is less than de minimis. While Hi-G, Inc.'s use of its corporate name has resulted in its identification to the public as a source of origin for the relays it sells, there was direct and uncontroverted evidence that it has never received an order for any goods of the plaintiff whether within or beyond the scope of the classification for which the defendant's mark was registered. There was no actual confusion.

---

4. That "hi-g" is generally regarded as having descriptive value gets some support from the fact that others have so used it. The Cook Electric Co. has adopted and registered the trademark "HY-G" for electric switches and electric relay controls. Air Associates Inc. has adopted and registered the trademark "HI-G" for passenger safety seat belts for use in automobiles. Bendix Aviation Corp. has adopted and registered the trademark "HY-G-300" for electron tubes. Consolidated Electrodynamics uses "High-g" to describe the thrusts its shock tester develops, while Colvin Co. advertises "HiG" Transducers. The Gordos Corp. uses the letters "Hg" in connection with its advertisements of its mercury control switches. The Clare Co. uses the letters "HG" and derivations thereof in the same manner. See Triumph Hosiery v. Triumph International Corp. (supra) fn. 2 at 199 of 308 F.2d; Cf. Avon Shoe Co. v. David Crystal, Inc. (supra) fn. 9 at 613 of 279 F.2d.

5. It did not appear that the original error was made by anyone with authority to request or make purchases for Honeywell. Further, there was no evidence that the sheet on which the error appeared was ever distributed to Honeywell's customers or to anyone outside its own organization before it was corrected.

*Likelihood of Confusion*

The extreme weakness of the case for likelihood of confusion is emphasized by the fact that most of the defendant's products are sold to manufacturers for incorporation into complicated machines. Much of the defendant's business is initiated by joint cooperation between the buyer and the defendant in the development of particular relays specially made to comply with technical specifications often requiring the defendant to make up and furnish samples for test purposes before production runs are set up. The defendant's relays are not found on the shelves of any retail store, Cf. Avon Shoe Co. v. David Crystal, Inc. (supra); Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc. (supra); LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115 (2 Cir., 1946) cert. denied 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663, or even in warehouses of independent regional distributors. They are sold directly to manufacturers for the most part though some business is drummed up by manufacturers' agents. The defendant does set up a booth at some of the "shows" where like and related products suitable for use in specialized industry are displayed to attract the attention of manufacturers. The defendant is also listed in Electronic Buyers' Guide and does some advertising in certain trade magazines whose subscribers are manufacturers. It would labor the obvious to explain that no one but a "sophisticated" buyer would ever purchase a miniature relay. See Sunbeam Lighting Co. v. Sunbeam Corp., 9 Cir., 183 F.2d 969, cert. denied 340 U.S. 920, 71 S.Ct. 357, 95 L.Ed. 665. About 95% of these products sold by the defendant are incorporated into missiles, aircraft and other machines for governmental end use, and these are usually manufactured to meet specifications specially drawn to insure unfailing operation under certain environmental and physical conditions. These relays may be small, but they are not inexpensive. The price of the average type is about $15.00 and they sometimes sell for as much as $200.00 each, and at these prices, their quality is of the highest. This is a stronger case than Federal Telephone & Radio Corp. v. Federal Television Corp., 180 F.2d 250 (2 Cir., 1950) for finding, both as to the actual products and the source of the products that " * * * confusion would not extend to those of the plaintiff's customers who are manufacturers, for such buyers know the persons with whom they deal * * *." Furthermore, the marks actually used by the parties are quite readily distinguishable. Anyone wanting one of the plaintiff's valves would not go elsewhere than to General Controls for it on account of confusion as to source of origin. Federal Telephone & Radio Corp. v. Federal Television Corp. (supra); J. R. Wood v. Reese Jewelry Corp., 278 F.2d 157 (2 Cir., 1960); John Morrell & Co. v. Reliable Packing Co. (supra), 295 F.2d pp. 316, 317. Finally, since the plaintiff prominently features both its primary mark "GC" and its corporate name in full in all advertisements in which its trademark "hi-g" appears, the mark "hi-g" standing alone cannot be held to have taken on a secondary meaning as a source of origin of products made by General Controls. The fact is that the plaintiff has never weaned the "hi-g" mark from its parent. Therefore, in the absence of any evidence of secondary meaning other than the sole statement of Mr. John Ray, vice-president of the plaintiff, that its customers sometimes use the "term 'hi-g' to designate a product line" of General Controls, the plaintiff has not discharged its heavy burden of establishing secondary meaning. Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861 (S.D.N.Y.1962); Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569 (2 Cir., 1959) cert. denied 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739; Hot Shoppes, Inc. v. Hot Shoppe, Inc., 203 F.Supp. 777 (M.D.N.C.1962).

*Defendant's Good Faith*

The plaintiff does not contend, nor is there any evidence to support a claim, that the defendant was not an innocent

junior user. The defendant adopted the name HI-G, Inc. in good faith, without knowledge of plaintiff's prior use or registration,[6] for business reasons, and without any design to pass off its product as having been manufactured by General Controls Co. or of appropriating the benefit of any advertising value which might have attached to the expression "hi-g" by reason of the plaintiff's efforts, Cf. Lincoln Restaurant Corp. v. Wolfies Rest., Inc., 291 F.2d 302 (2 Cir., 1961) cert. denied 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88, which is the kind of conduct against which innocence is tested. Triumph Hosiery Mills, Inc. v. Triumph International Corp. (supra), 308 F.2d p. 199. Furthermore, good faith is implicit in the fact that the defendant has always used its name in plain, black, block letters, whereas the plaintiff always uses its mark as a supplement to its larger composite trademark.

### Likelihood that the Prior Owner Will Bridge the Gap & Possible Injury to Plaintiff's Reputation

For more than 20 years, the plaintiff has not used the mark "hi-g" in connection with those electric relays it does make, none of which compete with those of the defendant. There is no demonstrable intent of the plaintiff to expand into lines made by the defendant and the defendant has not moved any closer to the plaintiff's line of goods during the years it has been in business. See Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., 105 F.2d 908, 911 (2 Cir., 1939) cert. denied 308 U.S. 616, 60 S.Ct. 262, 84 L.Ed. 515. No claim was made, nor was any evidence offered that the quality of the defendant's products is not as high as the plaintiff's; that its business is not conducted according to the highest standards; or that its activities have in any way produced or threatened to produce any injury to the

plaintiff's reputation. Thus, neither of the two conditions "(1) the prospect that the [plaintiff] will want to extend his activities into the disputed area and (2) the hazard that the owner's reputation may be tarnished by the use by another— which Judge L. Hand in his opinion in S. C. Johnson v. Johnson, 2 Cir., 175 F.2d 176, [at pp. 179–180] cert. denied 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949), thought should limit the extension of a trade-mark to cover related goods under the so-called 'Aunt Jemima' doctrine." Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407 (2 Cir., 1917) cert. denied 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918), are present in this case to aid the plaintiff. Triumph Hosiery Mills, Inc. v. Triumph International Corp. (supra) 308 F.2d at p. 198.

### Defense of Laches

An additional ground for denying an injunction lies in the facts that the plaintiff knew of the existence of HI-G, Inc. in its first year of existence, 1954, that the defendant began then to advertise openly, and became listed as a manufacturer of relays in the Electronic Buyers' Guide. After learning of the defendant's existence in 1954, the plaintiff stated that it adopted a "wait and see" attitude "to see if this newcomer in the business was going to bother our business, and we then kept our eyes and ears open as to the progress of the company from that point on." It was not until December 1, 1958 (when the defendant's annual volume, which had grown rapidly each year, reached $467,000) that the plaintiff wrote to the defendant requesting it to discontinue the use of "HI-G", and, despite a prompt rejection by the defendant, this suit was not begun until mid September, 1959. The equitable bar of laches is raised by these facts because " * * * it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait

---

6. Sight should not be lost of the fact that the plaintiff's registrations purport to cover its use of the mark on valves of varying descriptions and make no mention and hence give no notice of any use of the mark on electrical relays. See Avon Shoe Co. v. David Crystal, Inc. (supra), fn. 6 at 611 of 279 F.2d.

to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question." Valvoline Oil Co. v. Havoline Oil Co., 211 F. 189, 195 (D.C.S.D.N.Y.1913); Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822, 824–825 (2 Cir., 1943); Polaroid Corp. v. Polarad Electronics Corp. (supra), 287 F.2d pp. 497–498; Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp. (supra), 105 F.2d p. 911; Cf. Stardust, Inc. v. Weiss, 79 F.Supp. 274, 278 (S.D.N.Y.1948).

### Unfair Competition

 Plaintiff's claim for unfair competition raises no issues not already considered. There is no need to decide whether federal or state law applies to claims for unfair competition joined with claims of trademark infringement brought under the Lanham Act when there is no real difference between state and federal law. See Supreme Wine Co., Inc. v. American Distilling Co., 310 F.2d 888, 2 Cir., 1962, fn. 2; Maternally Yours v. Your Maternity Shop, 234 F.2d 538 (2 Cir., 1956). The rule as stated in the leading Connecticut case of Middletown Trust Co. v. Middletown National Bank, 110 Conn. 13, at p. 20, 147 A. 22 (1929) is not more restrictive upon an accused defendant. It held that, "No inflexible rule can be laid down as to what use of names will constitute unfair competition; this is a question of fact. The question to be determined is whether or not, as a matter of fact, the name is such as to cause confusion in the public mind as between the plaintiff's business and that of the defendant, resulting in injury to the plaintiff." Yale Cooperative Corp. v. Rogin, 133 Conn. 563, 53 A.2d 383 (1947); Eastern Wine Corp. v. Winslow-Warren Ltd., Inc., 137 F.2d 955 (2 Cir., 1943) cert. denied 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452; Yale University v. Benneson, 147 Conn. 254, 159 A.2d 169 (1960).

This memorandum of decision will constitute the court's finding of facts and conclusions of law in accordance with 52 (a) F.R.Civ.P.

Judgment may enter for the defendant HI-G, Inc. with costs.

IT IS SO ORDERED.